## THE STATE v. TAYLOR, *Appellant*.

### Division Two, March 1, 1898.*

**Murder:** KILLING IN DEFENSE OF ONE'S DWELLING. The maxim "every man's house is his castle" does not mean that the owner of a dwelling house has the right to take life because of trespass upon the dwelling house alone, irrespective of the nature of the trespass. To justify the taking of the life of the trespasser the trespass must be with a design to commit a felony thereon or therein, or upon its inmates. A mere civil trespass upon one's dwelling house does not justify him in slaying the trespasser. The owner may resist such a trespass, opposing force against force, but he has no right to kill unless it becomes necessary to prevent a felonious destruction of property or the commission of a felony therein, or to defend himself against a felonious assault upon his person or that of some member of his family.

*Appeal from Audrain Circuit Court.*—HON. E. M. HUGHES, Judge.

AFFIRMED.

---

*NOTE.—Decided November 9, 1897; rehearing granted, and again affirmed March 1, 1898.

*Edmonston & Cullen* and *Bickley & Bickley* for appellant.

(1)   At the common law a man can defend his dwelling house even to the extent of taking life if necessary to prevent an unlawful entrance, without being liable even for manslaughter. The defense of the dwelling house stands on different grounds from the defense of personal property. 2 Bishop's New Crim. Law, sec. 707; 1 Bishop's New Crim. Law, sec. 858; Wharton's Cr. Law [9 Ed.] sec. 503 and note 1; 1 Hale's P. C. 458, 486; 1 Chitty Cr. L. [4 Am. Ed.] 56; 1 East P. C. 321; 1 Russell on Crimes [5 Am. Ed.], 662; 4 Bl. Com. 223; *Com. v. Drew*, 4 Mass. 391; *Reg v. Sullivan*, Car & M. 209; *State v. Sellers*, 2 Halst. 220; *Hudgkins v. State*, 2 Kelly's, 173; *Haynes v. State*, 17 Ga. 465; *Temple v. People*, 4 Lans. 119; *Carey v. People*, 45 Barb. 262; *State v. Patterson*, 45 Vt. 308; *State v. Medlin*, 2 Winst. Law, 488; *Ford's Case*, J. Kel. 51; *State v. Taylor*, 82 N. C. 554; 1 Hawk P. C. [Curf. Ed.] p. 98, sec. 36; *Parrish v. Com*, 81 Va. 1; Nicholson's Translation of Britton, p. 113; *Pond v. People*, 8 Mich. 150; *Deforest v. State*, 21 Ind. 23; 6 Am. and Eng. Ency. of Law, title "Homicide," p. 606. (2) The doctrine that one can take life if necessary to prevent an unlawful entry into his habitation prevails in all its original strength in Missouri. *Morgan v. Durfee*, 69 Mo. 469; *State v. Kennade*, 121 Mo. 405; *State v. Pollard*, 139 Mo. 220.

*Edward C. Crow*, Attorney-General, and *Sam B. Jeffries*, Assistant Attorney-General for the State.

(1)   The right to defend person or property can only be exercised where it is actually necessary. The law of self-defense is a law of necessity. No instru-

ment or force beyond what will actually prove effectual can legally be employed, for if one stabs or shoots one who merely assaulted him with his fists or strikes before his peril is imminent, or when he is not in immediate danger, he commits a felonious homicide *State v. O'Connor*, 31 Mo. 389; *State v. Eaton*, 75 Mo. 586; *State v. Wilson*, 98 Mo. 440; *State v. Rider*, 95 Mo. 474. (2) The defendant here was really the aggressor in the last scene. If the defendant had reasonable cause to believe that the deceased only intended to chastise or whip him, this would not justify defendant in taking the life of deceased. Kelley's Crim. Law, sec. 519; *State v. Benham*, 23 Iowa, 154; *State v. Partlow*, 90 Mo. 608; *State v. Gilmore*, 95 Mo. 554; *State v. Berkley*, 92 Mo. 53; *State v. Parker*, 106 Mo. 217. (3) Entering into a man's house after warning not to enter does not necessarily constitute a forcible trespass, and one killing another under such circumstances, when there is not reasonable ground for apprehending imminent danger to his person or property, is guilty of either murder or manslaughter, according to whether or not the killing is accompanied with malice, expressed or implied. *Carroll v. State*, 23 Ala. 28; *State v. Partlow*, 90 Mo. 608; *Roberts v. State*, 55 Am. Dec. 97. (4) Danger of a battery being committed upon one will not alone justify the taking of human life. McClain on Crim. Law, sec. 302; *Eiland v. State*, 52 Ala. 322; *Scales v. State*, 96 Ala. 69; *State v. Jones*, 89 Iowa, 182. (5) One who commences an assault or voluntarily enters into a combat in which neither party uses dangerous weapons is not excused in going to the extent of taking life in avoiding a danger to his own life which arises by reason of the violence of the party whom he first assaulted. *State v. Starr*, 38 Mo. 270; *State v. McDonald*, 67 Mo. 13; *State v. Johnson*, 76 Mo. 121;

*State v. Davidson*, 95 Mo. 155; *State v. Gilmore*, 95 Mo. 554.   (6)   A homicide upon sudden combat is not excusable if undue advantage is taken of the adversary.   *State v. Christian*, 66 Mo. 138.

SHERWOOD, J.—The defendant, a negro, was awarded twenty years in the penitentiary for shooting and killing with a musket a negro boy some sixteen or seventeen years old.   The killing was done at Taylor's house.

Lee Smith, the deceased, went to Taylor's the evening of the homicide, as did a number of other negroes of both sexes.   After being there a short time, Smith became involved in a quarrel with defendant; both parties threw off their coats and after exchanging a few blows, Smith was led out or put out of the room, and walked away with a friend.   Having proceeded a short distance, Smith remembered that his coat had been left in Taylor's house, and saying he would return for it, went back toward Taylor's house, and in a very short space of time the report of the shot was heard which took his life, and his friend returning to Taylor's, found Smith shot through the body and dead, but without any weapons on his person, nor does it appear that he attempted to draw or use any.   He was shot just as he entered the room which he had so recently left.   There was testimony to show that he knocked or kicked the door open as he entered, and there was testimony of a contrary effect.

On Smith's return for his coat it seems his approach was heard, and Taylor was told that Smith was outside, when he ran into another room and seizing his musket returned and said:   "I will kill the first one that comes in."   Thereupon Caldwell, another negro, grabbed the musket and expostulated with Taylor, but to no purpose, and as Smith entered the door,

Taylor wrenched the musket away from Caldwell, and exclaiming: "Get away from that door, I will kill the first man that comes in," and immediately fired and Smith fell dead. Whereupon Taylor patted Caldwell on the shoulder and said: "I am the man that done it!"

The court gave of its own motion eleven instructions, one at the instance of the State and two at the request of defendant, and refused three asked by the latter. The instructions given by the court embraced murder in the first and second degrees, manslaughter in the fourth degree and self-defense. The jury returned a verdict for murder in the second degree. There was ample evidence to support the verdict, indeed to have justified a finding of murder in the first degree. It is difficult to see what evidence there was of self-defense, but of this defendant can not complain.

The instructions were in substance such as are usually given, and finding no error in the record, we affirm the judgment.

All concur.

## ON REHEARING.

GANTT, P. J.—The defendant was indicted in the Audrain circuit court for the murder of Lee Smith and was convicted of murder in the second degree and his sentence fixed at twenty years in the penitentiary. This cause was heard at the beginning of this term and the judgment of the circuit court was affirmed, but counsel for defendant having moved for a rehearing on the ground that this court had not considered certain instructions which the circuit court refused, it was granted.

The facts disclosed by the record are as follows:

The defendant, a negro man, lived in Mexico, Missouri, and on the night of the thirtieth day of

January, 1897, the defendant and several other negroes were in a saloon drinking beer from a can. Lee Smith, the deceased, was a negro boy about sixteen or seventeen years old. Prior to the thirtieth day of January, 1897, no trouble had occurred between defendant and deceased. About that time there were a number of young negro men, musicians from Moberly, staying at the house of defendant and they were accustomed to play on their instruments in the evenings, and their music attracted quite a number of their race to the house. After leaving the saloon that evening, defendant went to his home. It was disclosed in evidence that persons came and went in and out of the home of defendant without the ceremony of knocking. In the house at the time mentioned were several young negro men and young negro girls in different rooms. Shortly after defendant went home the deceased appeared in the house, and very soon thereafter a controversy arose between defendant and deceased as to which was the better man, physically, and the undisputed testimony shows that each of them pulled off his coat and went to fighting with their fists. The deceased was ejected from the house and went out with one Bright, who was a witness, and when he passed out of the house he was without his coat, and after going a short distance with Bright he decided that he would return and obtain his coat. Bright went on and deceased returned to defendant's house, and the evidence shows when he returned the defendant was told Smith was outside, when he ran into another room and seizing his musket returned and said: "I will kill the first one that comes in." Thereupon Caldwell, another negro, grabbed the musket, and expostulated with Taylor, but to no purpose, and as Smith entered the door, Taylor wrenched the musket away from Caldwell, and exclaiming, "Get away

from that door, I will kill the first man that comes in,'' immediately fired and Smith fell dead. Whereupon Taylor boasted to Caldwell that he had fired the shot. The coroner was immediately summoned and examined the body of Smith but found no weapons upon him. There was some testimony that Smith pushed or kicked the door open as he entered on his return, but there was counter evidence for the State contradicting this evidence, tending to show that there was no sign of violence to the door and the locks and latches were uninjured.

The instructions given by the court embraced murder in the first and second degrees, manslaughter in the fourth degree and self-defense.

I. The instructions for murder in the first and second degrees were in the form often approved by this court and for that reason are not reproduced here. Indeed they are not challenged by counsel for defendant. This appeal is based upon the contention that the circuit court misapprehended the law as to the right of a man to defend his dwelling house from an unlawful trespass. To present the point we here copy the court's instructions which are so earnestly controverted by defendant.

"6. If the jury find from the evidence that the defendant and deceased engaged in a mutual altercation, and each inflicted blows and violence upon the other in the dwelling house of defendant, and that they were separated from each other during the fight, and the deceased ejected from the house, and the door thereof shut and fastened, and shortly thereafter the deceased either kicked or struck said door and forced it open, and was in the act of entering said house when the defendant shot and killed him, and at the time he so shot deceased, defendant had no reasonable cause to apprehend on the part of deceased a design to do him

some great personal injury, and there was no reasonable cause for him to apprehend immediate danger of such design being accomplished, then he was not justified in shooting the deceased, but is guilty of murder in one of the degrees, or manslaughter in the fourth degree (as explained in other instructions), that is, if he so shot and killed deceased willfully, deliberately, premeditatedly, and of his malice aforethought, he is guilty of murder in the first degree. If he shot and killed deceased willfully, premeditatedly and of his malice aforethought, but without deliberation, he is guilty of murder in the second degree; if he so shot and killed deceased in a heat of passion resulting from the fight between them had shortly theretofore, and sufficient time had not elapsed after said fight and before the shooting for the blood to cool and reason to assert its sway, or if sufficient time had elapsed after and before the shooting for the blood to cool, and the deceased at the time he was shot was attempting to renew the fight and assault the defendant otherwise than with some deadly weapon, such as a pistol or a knife, and defendant had no reasonable cause to apprehend on the part of the deceased a design to do him some great personal injury, and no reasonable cause to apprehend that there was immediate danger of such design being accomplished, then defendant is guilty of manslaughter in the fourth degree.''

"7.   The court instructs the jury that the defendant had the legal right to eject, or cause to be ejected from his dwelling house, the deceased, Lee Smith. And the deceased had no right to re-enter the said house against the known wishes and consent of defendant, and if the jury find that the deceased after being ejected from said house, shortly thereafter forced open the door of said dwelling house and was in the act of entering said house, then the defendant had the legal right to resist and prevent the entrance into his said

house of deceased and to use all such means and power as were necessary for that purpose, except the taking of Smith's life, or employing such means as were reasonably calculated to endanger human life. And if the jury find that defendant shot and killed deceased, as the deceased was entering his house, without employing, or attempting to employ any other means to prevent the entrance of deceased into said house, then unless the jury find that he was justified in shooting and killing deceased under the plea of self-defense, as explained in other instructions, the defendant is guilty of murder in one of its degrees, or manslaughter in the fourth degree, as these offenses are explained in other instructions."

Those asked by defendant and refused were as follows:

"15. The court instructs the jury that the right of one to dwell undisturbed in his own house is a right which the law not only concedes to all men, but guarantees it to them. Under the law the house of every one is to him as his castle and fortress, as well for his defense as for his repose, and the law never requires one to retreat from an attack made upon him or any member of his family while within the dwelling house; and the jury are further instructed, that so long as one occupies his habitation, no private person has a right to enter or to attempt to enter the same by violence or surprise against the known will of the occupier, and the occupier has the right to forbid such attempt or entry by words or acts and to use all necessary force to prevent the same. In resisting such attack or intrusion, the law authorizes the occupier of the habitation to act upon appearances and justifies him in meeting force with force and will hold him blameless if he slays the attacking party at a time and under such circumstances as would cause a reasonable man in his position

to believe that such killing was reasonably necessary to preserve the peace of the family, prevent the intruder from gaining entrance to his habitation, and to protect himself or any member of his family then present from great bodily harm.

"16.   The court instructs the jury that the occupant of a house has a right to resist, even unto the death, the entrance of a person to force himself into it against his will when no action less than killing is sufficient, or when on reasonable grounds nothing less appears to be sufficient to defend the house from entrance; and in this case, if you believe that the deceased was making a forcible entry into the house of the defendant and nothing less than killing was sufficient to prevent such entrance, or on reasonable grounds it appeared that nothing less than killing would prevent such entrance and that defendant shot to prevent such entrance, then he is not guilty and you will acquit him.

"17.   The court instructs the jury as a matter of law:   That the dwelling house of every man is to him as his castle and fortress, as well for defense against injury and violence as for his repose; and so long as he or his family occupies said dwelling house, no private person has the right to break into or by surprise or by violence enter or attempt to enter said dwelling house against the will of the occupier; and the occupier of such dwelling house is invested by the law with authority to employ all the means within his reach, all the energies under his control, and to take life, if reasonably necessary, to prevent an entrance into his habitation. Therefore, if you believe from the evidence in this case that Lee Smith, in the night was endeavoring to make a forcible entrance into defendant's habitation against his will, and that while so doing, defendant shot, and that such

shooting was apparently necessary to prevent Smith's entering, then you will find defendant not guilty."

In a word it will be seen that defendant insists that defendant's dwelling house being "his castle" he had a right to defend it from a trespass even to the killing of deceased; that he had a right to take the life of deceased because of the trespass upon the dwelling house alone, irrespective of the nature of the trespass, whether it was committed with a design to commit a felony thereon or therein or upon its inmates, or was a mere trespass upon the property. That "one's dwelling house is his castle" is a maxim of the common law. This was ruled in *Semayne's* case, 5 Coke's Rep. 91 A.: "The house of every one is his castle and if thieves come to a man's house to rob or murder and the owner or his servants kill any of the thieves in defense of himself and his house it is no felony and he shall lose nothing." 3 Thos. Coke's Rep. 188. The principle is of feudal origin and essentially necessary in the early history of England when men were compelled to defend themselves in their homes, by converting them into fortified castles. It will be observed that in *Semayne's* case the right to kill was limited to the resistance of the commission of a felony. It is insisted by defendant that at common law one was justifiable in killing a mere trespasser upon his dwelling house. We do not so understand the sages of the law.

Thus Lord HALE in his Pleas of the Crown, 1 Hale P. C. 485, says: "I come to consider what the offense is in killing him that takes the goods or doth injury to the house or possession of another. And herein there will be many diversities; as, *first*, between a *trespassable act* and a felonious act, and between felonious acts themselves." The learned author then proceeds to comment upon *Harcourt's* case as follows: "This was *Harcourt's* case (Crompt. 27*a*): Harcourt being in pos-

session of a house by title, as it seems, A. endeavored to enter and shot an arrow at them within the house and Harcourt from within shot an arrow at those that would have entered, and killed one of the company. This was ruled manslaughter—5 Eliz.—and it was not *se defendendo because there was no danger of his life from them without.*" Again in *Meade's* case, 1 Lewin Crown Cases, 184, it appeared that Meade had rendered himself obnoxious to the boatman at Scarborough by informing the excise officer of smuggling, and the boatmen in revenge met him on the beach and ducked him and were in the act of throwing him in the sea when he was rescued by the police. As he was going away they called to him that they would come at night and pull his house down. In the middle of the night a great crowd assembled around his house singing songs of menace and using violent language, indicating they had come to carry out their threats of the day previous, and Meade under apprehension, as he alleged, that his life and property were in danger fired a pistol by which Law, one of the crowd, was killed. HOLROYD, J., charged the jury: "A civil trespass will not excuse the firing a pistol at a trespasser in sudden resentment or anger. If a person takes forcible possession of another man's close, so as to be guilty of a breach of the peace, it is more than a trespass. So if a man with force invades and enters into the dwelling of another. *But a man is not authorized to fire a pistol on every intrusion or invasion of his house.* He ought if he has a reasonable opportunity to endeavor to remove him without having recourse to the last extremity. But the making an attack upon a dwelling and especially at night the law regards as equivalent to an assault on a man's person, for a man's house is his castle, and therefore in the eye of the law it is equivalent to an assault, but no

words or singing are equivalent to an assault, nor will they authorize an assault in return. . . . . . . In the present case if you are of opinion that the prisoner was really attacked and that the party were on the point of breaking in or likely to do so *and execute the threats of* the day before, he perhaps was justified in firing as he did.''

In that case a verdict of manslaughter was sustained. What then is the significance of the expression in criminal law of the phrase, ''A man's dwelling house is his castle.'' The answer we think is found in Hale and East Pleas of the Crown. Thus in 1 Hale P. C. 486, it is said in commenting upon *Harcourt's* case: ''And so it had been if A. had entered upon him (i. e. into Harcourt's house) and assaulted him first, tho' he intended not to kill him, yet if Harcourt had thereupon killed A. it had been only *se defendendo* and not manslaughter, tho' the entry of A. was not with intent to murder him, but only as a trespasser to gain possession (3 E. 3 Coron. 305, Cromp. 27b),.and *it seems to me in such a case Harcourt being in his own house need not fly as far as he can as in other cases of se defendendo for he hath the protection of his house to excuse him from flying, for that would be to give up the possession of his house to his adversary by his flight.''*

Unquestionably Lord HALE correctly states the law when he declares that a man need not fly from his house when he is assaulted therein, but it is submitted that his comments upon *Harcourt's* case are not supported by that case nor by his own clear statement of the law elsewhere, nor by the other standard common law authorities. East, in his Pleas of the Crown, volume 1, page 321, challenges Lord HALE's comments on *Cooke's case* (Cro. Car. 537), in which Lord HALE, discussing the right to break the outer door in serving civil process, says: ''But, thirdly, had he (Cooke) not known

him to be a bailiff, or one who came on that business, it (the killing) had been no felony *because done in his house,*" and says: "This last instance, which is set in opposition to the second, must be understood to include at least a reasonable ground of suspicion that the party broke the house *with a felonious intent,* and that the owner of the house did not know nor had reason to believe that it was merely as a trespasser with a different intent." 1 Russell on Crimes [7 Am. Ed.], 662, lays it down that "if A. in defense of his house kill B., a trespasser who endeavors to make an entry upon it, it is *at least* common manslaughter *unless there were danger of his life.*" Plainly indicating that to justify taking the life of the trespasser, his assault must have been with intent to commit a felony and not a mere trespass against the possession of the owner. Mac-Nally, in his "Rules of Evidence on Pleas of the Crown," *page 562, thus states the rule: "In cases of justifiable self-defense by force in defense of his person, habitation or property against one who manifestly intendeth and endeavoreth by violence or surprise to commit a *known* felony upon either." "In these cases he is not bound to retreat but may pursue his adversary until he findeth himself out of danger, and if in such conflict he happeneth to kill, such killing is justifiable." 1 Russell on Crimes [7 Am. Ed.], 668.

1 Russell on Crimes [7 Am. Ed.], 668, says: "The rule clearly extends only to cases of felony." "No assault, however violent, will justify killing an assailant . . . . . . . unless there be a manifestation of felonious intent." 1 Russell on Crimes [7 Am. Ed.], 669; 1 Hawkins P. C. 108 and 109. It is not deemed essential to quote further from the common law writers to establish that when Lord Hale speaks of the right of the owner to kill a trespasser in his dwelling house when assaulted he must be understood to have meant

a felonious assault upon the house or inmates; otherwise, his statement is not in harmony with the great weight of common law authority.

Let us inquire as to our own country. Dr. Wharton, in his work on the law of homicide, in section 541, under the head of "Protection of Dwelling House," says: "When a person is attacked in his own house he need retreat no further. Here he stands at bay and may turn on and kill his assailant *if this be apparently necessary to save his own life,* nor is he bound to escape from his house in order to avoid his assailant. In this sense and in this sense alone are we to understand the maxim that 'every man's house is his castle.' An assailed person, so we may paraphrase the maxim, is not bound to retreat out of his house to avoid violence, even though a retreat may be safely made. But he is not entitled either in the one case or the other to kill his assailant unless he honestly and non-negligently believes *that he is in danger of his life from the assault,"* or when a *felonious assault is being made upon the house as to commit burglary, arson or other felony therein or against its inmates.* This statement of the law is abundantly sustained by Archbold's Criminal Law, p. 221, and the authorities there cited. *Reg v. Bull,* 9 C. & P. 22. See, also, *People v. Walsh,* 43 Cal. 447; *Carroll v. State,* 23 Ala. 28; *De Forest v. State,* 21 Ind. 23; *State v. Patterson,* 45 Vt. 308; *Morgan v. Durfee,* 69 Mo. 469.

It may as well be noted that if the aggressor is about to commit a felony it is wholly immaterial whether it is a felony at common law or by statute. In either case the owner of the house may protect himself or his house from the perpetration of a felony against either without retreating therefrom. Davis, Crim. Law, p. 156. The foregoing view of the law has been adopted by the General Assembly of this State in defin-

ing justifiable homicide. *State v. O'Connor,* 31 Mo. 389. Section 3462, Revised Statutes 1889, provides that: "Homicide shall be deemed justifiable when committed by any person in either of the following cases: *First,* in resisting any attempt to murder such person or to commit any felony upon him or her or *in any dwelling house in which such person shall be,"* etc.

We have thus gone at length into a review of the law upon this subject and we deduce from the decided cases and the standard authors that a mere civil trespass upon a man's dwelling house does not justify him in slaying the trespasser; that the owner may resist the trespass, opposing force against force, but he has no right to kill unless it becomes necessary to prevent a felonious destruction of his property, or the commission of a felony therein, or to defend himself against a felonious assault against his life or person; that if he kills without reasonable apprehension of immediate danger to his person or property, but in the heat of passion aroused by the trespasser, it will be manslaughter, but if one deliberately or premeditatedly kills another to prevent a mere trespass upon his property whether that trespass could or could not otherwise be prevented, he is guilty of murder. Archbold's Crim. Law, 225. It is clear from a reading of the instructions that the circuit court so understood the law and correctly expounded it to the jury. There was ample evidence from which the jury could have found the defendant guilty of murder in either degree, and as no error was committed on the trial, the judgment is affirmed as first ordered and rehearing denied. SHERWOOD and BURGESS, JJ., concur.