## Cicero H. Thompson v. State of Nebraska.

Filed January 23, 1901.   No. 11,493.

1. **Instruction: Defense of Domicile.** An instruction charging that: "An assault on the house can be lawfully resisted to the extent of killing the assailant or assailants only in case the assault is made with the intent either of taking the life of the inmate or of doing him great bodily harm, and that such resistance was necessary to prevent such crime or in case the inmate acting honestly had reason to believe from the acts, facts and circumstances and in fact did believe that it was necessary to prevent the commission of such crime," is erroneous.

2. **Defense of Domicile.** A man may defend his domicile, even to the extent of taking life, if it be actually or apparently necessary to do so in order to prevent the commission of a felony therein. Whether this is the precise limit of the domiciliary right is not determined.

3. **Theory: Evidence.** The submission to the jury of a theory which has no basis in the evidence, is error.

4. **Extortion: Unnatural Sin: Threat of Exposure: Robbery.** Evidence that money or goods were obtained from a man by taxing him with the practice of an abominable wickedness and threatening to expose him, may be sufficient to establish the crime of robbery.

5. **Self-Defense: Breaking and Entry: Felonious Intent.** The occupant of a dwelling may lawfully kill, as a necessary measure of defense, a person who attempts to break and enter with the intention of extorting money by charging him with the commission of an infamous offense against nature and threatening to expose him to public reprobation and contempt.

6. **Instruction: Error Not Cured by Another Stating Law Correctly.** An instruction which misstates the law is not cured by giving another which states it correctly. The jury should not be required to choose between conflicting instructions.

7. **Plea in Abatement: Preliminary Examination.** A plea in abatement, grounded on the facts that defendant had two preliminary examinations and that on the first he was held for a lower grade of crime than upon the one which is the basis of the information filed against him, is demurrable.

Error from the district court for Cherry county. Tried below before Harrington, J. Reversed.

Frank M. Wolcott and Moses P. Kinkaid, for plaintiff in error:

The witness Milliman swore that the witness and the

Thompson v. State.

deceased were entering the defendant's domicile with intent to extort money from the defendant by putting him in fear of the loss of his reputation.

"If any person shall forcibly, and by violence, or by putting in fear, take from the person of another any money or personal property. of any value whatever, with the intent to rob or steal, every person so offending shall be deemed guilty of robbery." Criminal Code, sec. 13.

The foregoing statute is declaratory of the common law. Coke, 2 Institutes, 308; Bishop, Statutory Crimes, pp. 5-8, 82, 86, 88, 131-144.

. Robbery, by common law, is larceny from the person accompanied by violence or putting in fear. Anderson, Black, Bouvier, Dictionaries; Wharton, Lexicon; Russell, Crimes. But both these circumstances need not occur. Rawle, Bouvier's Law Dictionary, p. 935, art. Robbery; *Williams v. State*, 51 Nebr., 711.

Blackmail is robbery under the statute. It is defined: "A certain rate of money, corn, cattle, or other thing, anciently paid, in the north of England and south of Scotland, to certain men, who were allied to robbers, to be by them protected from pillage." Webster, Dictionary. In the United States: "Extortion of money from a person by threats of accusation or exposure." Bartlett, Synonyms.

The deceased, Arthur London, was breaking a mansion house in the night season to extort money by threat of accusation and exposure. The defendant slew him to defend himself from a felony. The act was justifiable homicide.

*Constantine J. Smyth, Attorney General,* and *Willis D. Oldham, Deputy, contra.*

SULLIVAN, J.

In the district court for Cherry county Cicero H. Thompson was found guilty of murder in the second degree and sentenced to imprisonment in the penitentiary for fifteen

years. The conviction apparently was the result of erroneous rulings, and must, therefore, be set aside. We can not consider in detail all the specifications of error discussed by counsel. They are altogether too numerous to be given separate treatment. For the most part they depend upon a few principles which, if recognized and properly applied, will prevent on another trial a repetition of the errors of which the defendant complains.

On the night of the tragedy Thompson was alone in his cottage in the city of Valentine. About 2 o'clock A. M., Arthur London, the deceased, with a companion named Milliman, rapped for admittance. Receiving no response from within they broke open the door and were about to enter, when they encountered the defendant, who commenced shooting at them. Five shots were fired. Milliman fell in the storm-shed and London lay mortally wounded just outside the threshold. Two theories of the case were submitted to the jury. The theory of the defense was that all the shots were fired by Thompson in the belief that his home was being broken and entered by robbers. The state's hypothesis was that the defendant recognized London when he first sought to gain admittance and knew that his purpose was to obtain money by threatening to publish a report to the effect that defendant was addicted to the practice of an abominable vice. It was also contended by the county attorney that the fatal shot was fired after London had retreated and while he lay helpless on the ground. There is no sufficient basis in the evidence for the theory that Thompson did the killing to protect himself from blackmail. There is nothing in the record from which it may be inferred that he knew, or had reason to believe, that the deceased intended on the night in question, or at any other time, to extort money from him by any species of intimidation. If it be true that London and Thompson had been accustomed to wallow together in the ooze and slime of a detestable sensualism, it does not by any means follow, as a natural or probable con-

clusion, that either would use his knowledge of the other's baseness as a means of obtaining money. The jury might, perhaps, have been justified in finding that the defendant recognized London before he shot him, but there was no sufficient evidence from which to conclude that the motive for the shooting was to prevent blackmail.

Some of the instructions touching the right of the accused to defend his habitation are erroneous. In the seventeenth paragraph of the charge it is said: "An assault on the house can be lawfully resisted to the extent of killing the assailant or assailants only in case the assault is made with the intent either of taking the life of the inmate or of doing him great bodily harm, and that such resistance was necessary to prevent such crime or in case the inmate acting honestly had reason to believe from the acts, facts and circumstances and in fact did believe that it was necessary to prevent the commission of such crime." The same thought is expressed in the eighteenth paragraph. The doctrine of these instructions is not, we believe, sustained by any adjudged case, although there are *dicta* in the opinions of courts and expressions in the text-books on criminal law that seem to give countenance to it. The true rule undoubtedly is that a man may defend his domicile, even to the extent of taking life, if it be actually or apparently necessary to do so in order to prevent the commission of any felony therein. *Semayne's Case*, 3 Coke, 91; *Foster's Crown Cases*, 273; *State v. Patterson*, 45 Vt., 308, 12 Am. Rep., 200; *Wright v. Commonwealth*, 85 Ky., 123; *State v. Taylor*, 143 Mo., 150. Whether this is the precise limit of the domiciliary right it is not here necessary to determine; but if it is the limit, then popular sentiment is not in accord with the law.

Another phase of the case seems to have been entirely overlooked at the trial. The right of the accused to resist an aggression having for its object the obtaining of money by threats of injury to his reputation was ignored.

There is no good reason why the law should differentiate between a threat to inflict physical injury and a threat to cause mental suffering. One may diminish the value of existence quite as much as the other. Of this fact the criminal law has but a dim perception; it is seen, but not seen clearly. If the mental anguish is acute and in its very nature calculated to lower the tide of life, the law takes cognizance of it. It appears from the authorities, ancient and modern, that the extortion of money by threatening to smirch a fair reputation is so atrocious a wrong that it is generally regarded as robbery, especially if the vice or crime imputed is an unnatural one. This being so it would seem that if London and Milliman came to the defendant's house with the intention, as claimed by the state, of obtaining money by taxing him with the commission of an infamous offense against nature and threatening to expose him to public reprobation and contempt, he might lawfully kill them as a necessary measure of defense, even though divining their purpose, or having actual notice of it. Under these circumstances the breaking and entry would be felonious because done with intent to rob. Evidence that money or goods were obtained from a man by putting him in fear of an injury to his property or reputation may, it is said, be sufficient to establish the crime of robbery. 1 Wharton, Criminal Law, sec. 852; Desty, American Criminal Law, sec. 142d; 3 Greenleaf, Evidence, secs. 233, 234; *Long v. State*, 12 Ga., 293; *Britt v. State*, 7 Humph. [Tenn.], 45. "As to the fear of injury to the reputation," says Greenleaf (sec. 234), "it has been repeatedly held that to obtain money by threatening to accuse the party of an unnatural crime, whether the consequences apprehended by the victim were a criminal prosecution, the loss of his place, or the loss of his character and position in society, is robbery." The instructions precluded the jury from considering this aspect of the case, and thereby deprived the defendant of a valuable right.

The seventh paragraph of the court's charge is a de-

fective definition of murder in the second degree. The attorney general does not defend the instruction, but contends that it furnishes no ground for reversal, because the elements of the crime were correctly stated in another instruction. This question is not a new one. It has been frequently decided by this court, and the rule is a just one and founded in good sense, that the jury should not be required to choose between conflicting instructions. *First Nat. Bank v. Lowrey*, 36 Nebr., 290; *Carson v. Stevens*, 40 Nebr., 112; *Richardson v. Halstead*, 44 Nebr., 606; *Barr v. State*, 45 Nebr., 458; *Metz v. State*, 46 Nebr., 547.

The demurrer to the plea in abatement was properly sustained. The fact that the defendant had two preliminary examinations, and that he was held only for manslaughter on the first, did not entitle him to immunity from prosecution for murder. The decision of the county judge furnished the basis for prosecuting the prisoner for one crime; the decision of the justice of the peace gave the right to put him on trial for another crime. There has never been any doubt about the power of the grand jury to return two indictments against a party grounded on the same criminal act; and no reason is suggested why an examining magistrate may not exercise, under the new procedure, the jurisdiction which the grand jury exercised under the old. *Bartley v. State*, 53 Nebr., 310; *Roby v. State*, 61 Nebr., 218.

The judgment is reversed and the cause remanded.

REVERSED AND REMANDED.