# PAUL COLLEGENIA v STATE.

No. A-1496.  Opinion Filed May 21, 1913.

(132 Pac. 375.)

1. HOMICIDE—Defense of Domicile—Right. A man has the right to defend his domicile against every unlawful invasion and to defend himself and those within it against every and all violence, without the necessity of retreat, even to the extent of taking life, if it be actually or apparently necessary to do so in order to prevent the commission of a felony thereon or therein.

2. SAME—Defense of Domicile—Extent of Right. The law in its humanity will not justify the taking of a life to repel a mere trespass or invasion of the home without felonious intent or in resisting a nonfelonious assault, but a man who is without fault may repel force with force in defense of his person, habitation, or property against any one or many who manifestly intend and endeavor with violence to commit a felony thereon or therein. In such case he is not compelled to retreat, but may pursue his adversary until he finds himself out of danger, and, if in the conflict between them he happens to kill him, such killing is justifiable.

3. ARREST—Homicide—Without Warrant—Resistance. A peace officer may arrest without a warrant for a misdemeanor committed or attempted in his presence, and a person so arrested has no lawful right to resist. However, if the lawful power to arrest is exercised in such a wanton and unlawful manner as to make such officer a trespasser, resistance will be justified.

4. HOMICIDE—Arrest Without Authority—Rights of Officers. A peace officer making an arrest without authority to do so occupies the same relations to the party arrested that any other private citizen would. He is a trespasser who has no right to detain the person, and hence no right to prevent an escape, and in preventing an escape he is still a trespasser.

5. SAME—Questions for Jury—Evidence—Trespasser—Peace Officer. The defendant being, where he had a right to be, on his own premises at the time the deceased assaulted him with a deadly weapon, and it being a disputed fact whether the defendant by his conduct in any way provoked the deceased to so assault him, the question was for the jury to determine as a question of fact upon all the evidence, and for this reason the court had no right in charging the jury to assume that the deceased as a constable and his deputies were not trespassers, and that the defendant was not without fault, or that the deceased as such peace officer

was justified in making an assault with a deadly weapon upon the defendant.

6. **TRIAL—Duty to Instruct—Requests—Self-Defense.** In a prosecution for murder, the court should instruct upon the law applicable to the case, whether requested to do so or not. The law applicable is determined by the accusation and the evidence introduced upon the trial, and, when the evidence tends to show justification in self-defense and in defense of habitation it is the duty of the court to submit instructions properly embracing the law of self-defense.

7. **TRIAL—Instructions—Weight of Evidence.** On the trial of an indictment or information, questions of law are to be decided by the court and questions of fact are to be decided by the jury, and the court has no right in charging the jury to submit any proposition which assumes any particular controverted fact to be proven, which is an expression upon the weight of the evidence or credibility of a witness, or which requires the jury to give more credit to one class of testimony than some other. The jury must be left entirely free to determine all facts, the weight of the testimony, and the credit to be given the witnesses.

8. **HOMICIDE—Instruction—Sufficiency of Evidence.** The evidence reviewed, and held not to warrant a charge on murder.

(Syllabus by the Court.)

*Appeal from District Court, Washington County;*
*R. H. Hudson, Judge.*

Paul Collegenia was convicted of manslaughter in the first degree, and appeals. Reversed and remanded.

*J. R. Charlton,* for plaintiff in error.

*Chas. West,* Atty. Gen., and *Smith C. Matson,* Asst. Atty. Gen., for the State.

DOYLE, J. The plaintiff in error, hereinafter referred to as the defendant, was convicted of manslaughter in the first degree under an information filed in the district court of Washington county April 29, 1911, charging him with the murder of W. H. Jones in said county on or about the 15th day of February, 1911, and in accordance with the verdict of the jury was sentenced to serve a term of 15 years' imprisonment in the penitentiary.

The judgment and sentence was rendered and entered May 29, 1911, and on the following day the defendant was delivered into the custody of the warden of the penitentiary at McAlester. To reverse the judgment an appeal by case-made, containing a complete transcript of the record and testimony, was perfected by filing the same with a petition in error in this court November 22, 1911.

At the trial there was evidence tending to prove the following facts: The defendant, Collegenia, is an Austrian, who at the time of the homicide was 28 years of age, and had been in this country about 5 years. During the greater part of that time he had lived about Bartlesville, working in the smelters, and had lived with George Solinsky, in Smeltertown, for about two years. Solinsky's home was a two-room house on the south side of the street, with a porch and two outside doors on the east side facing Conrad's place, which was about 50 feet distant and nearer the street, with a door and porch facing the street. Between these houses towards the rear was a shack. W. H. Jones, the deceased, was a constable of Jackson township, Washington county, and was a large, powerful man. With two deputies he went to Solinsky's home, and while there made an assault with a deadly weapon upon the defendant in his dooryard, and within the space of a few minutes the shooting became general and Jones received a mortal wound.

A substantial statement of the testimony of each witness who testified in the case is as follows:

The state's first witness, V. D. McAlester, testified that W. H. Jones called him out of a pool hall in Bartlesville and told him that he wanted him to go to the end of the car line with him; that there was some trouble down there, and deputized him to go with him as a deputy constable; that Oscar Kelly went with them; that they went to the end of the car line and then went west to Conrad's place and found four Polacks in there that had been having trouble; that they turned them out and some one threw a rock against the build-

ing, and they caught the man and left Oscar Kelly with him, and they went around between the Solinsky house and the shack; that a young man came out of the shack with a beer bottle in his hand, and Jones grabbed the bottle, and the young man started to run in the shack, and they caught him as he ran in the door and put him under arrest, and "these men and three women tried to take him away from us, and the defendant came up." The record then shows his testimony as follows:

"Q. What did he do? A. He came up to Jones and Jones told him to stay back, and he kept coming at him. Q. Describe to the jury what he did. A. I was in a position where I could not see exactly what he was doing, because Jones was between him and me; I seen him when Jones hit him with his revolver and knocked him down. Q. Then what happened? A. He ran at Jones and after he drew back to hit him I could not see. And Jones kept poking his revolver in his face and told him to stay back or he would shoot him, and finally Jones raised his gun and shot above his head, and this man turned and ducked right around the south side of this building, and he said, 'I will kill you, God damn you.' Q. What then? A. By the time he got around to the north of this house he went into the door. The door sets on the east side of the house, in the north room, and he went over to the northwest room and took a shotgun down off the wall and started to the door, and we went into Conrad's place then. Q. Then what did he do? A. He turned and walked out this north door. Jones was a little bit in front of me, and we could see this man with the gun. Q. Who else went out with you? A. I could not swear as to who else. Q. What door did you go out? A. At the north door. Q. What did you step on when you went out? A. Stepped out on Conrad's porch. Q. Go on and tell what happened. A. We seen this man in the door with a shotgun. Q. What door was he in? A. In the north door of the Solinsky house. Q. What happened? A. He raised his gun as we stepped out of the house. Jones stood in front of me two or three feet west on the porch, and I was standing back of him. Q. Then what happened? A. This man with the shotgun fired, and we both commenced to shoot; I shot three shots and Jones shot the same; this man in the door

shot the first shot; and when we shot the three shots Jones said that they had shot him. Q. Go on. A. As he said they had shot him Oscar Kelly took hold of him and we both took him in the house. Q. Where was he shot? A. In the right leg, and one shot in the right hand, in between these two fingers."

On cross-examination he stated that he had never been deputized before by Mr. Jones, and that after going into Conrad's place he did not see anything to indicate that there was any disturbance out there, and he could not say why they went down between the shack and Solinsky's house.

Oscar Kelly testified that:

"When we reached Conrad's place we found four Poles in there and we put them out the front door and told them to go on and go home; then somebody threw something and hit the corner of the house and Jones and I took after a fellow that was running and caught him and arrested him, and I took the fellow into Conrad's store. I could hear a noise between the two houses and told Conrad to take care of the man that I had, and I started out and met Jones and McAlester and went back into Conrad's with them. We stayed in the house probably four or five minutes, talking about the situation, and then we stepped out on the porch. A man was standing in the door of Solinsky's house with a gun in his hands, and I heard a shot, and we all three fired. Some shot struck the corner of the house and some pop boxes that were on the porch and Jones was hit on the left side. I had a 45 pistol and fired two shots. I do not know how many shots Jones and McAlester fired."

Lincoln Luman testified that he was standing across the street in the door of the south furnace and as near as he could tell the defendant fired four shots; that he fired one shot and as quick as he could tell it the others fired; that he went back on the furnace and laid down, and the next morning he found four empty shotgun shells in Solinsky's dooryard. On cross-examination he stated that he had no use for Polish people.

Ralph Yazel testified that he was with Mr. Luman and

saw four gun flashes near Solinsky's house, and that five shots were fired from Conrad's porch.

Dr. O. S. Summerville testified that he was a physician and surgeon, and as such attended W. H. Jones, and that he died the second day after from the effect of a gunshot wound.

John Crane testified that he was a surveyor and made a survey of the scene of the homicide, and the Conrad and Solinsky's buildings are about 60 feet apart.

On behalf of the defendant George Solinsky testified, through an interpreter: That he was a smelter worker, and the defendant lived in the north room of his house. That the first time he saw Mr. Jones he was holding a revolver in his hand pointing it at somebody in the shack, and then Jones took somebody by the arm and the man got away from him, and Jones walked up to the defendant and hit him on the head with a revolver; the revolver went off; and the defendant fell to the ground. That Jones fired another shot after the defendant fell. That the defendant was not doing anything; he was simply standing in the yard about five feet from the house and did not touch Jones. That somebody spoke and Jones said he did not give a damn whether he killed two or three Polacks. That the defendant called to his wife "that she should go for a doctor, for Jones had killed him." That his wife went after a doctor and he and another party carried the defendant into his room. That he took his child and went into the house, and shortly afterwards several bullets were shot into the house. That when the shooting was over defendant was lying in the yard unconscious.

Tilla Solinsky testified through an interpreter that she was standing in the door when a man walked out of the shack and Jones grabbed him by the arm; that several men followed the man out and asked Jones why he wanted him; that the defendant was standing in their yard and the man got away from Jones and then Jones hit the defendant over

the head with a revolver and it went off; that Jones moved away two or three feet and shot again; that the defendant fell and the blood run out of his forehead and he said in Polish, "They have killed me, go for a doctor," that she gave her child to her husband and went to the smelter and phoned for a doctor; that she was gone about five minutes and when she came back the defendant was lying on the porch unconscious; that the defendant did not touch Jones.

Antono Belitz testified, through an interperter: That he was standing in Solinsky's dooryard when the boy came out of the shack and Jones grabbed him by the arm. The boy did not want Jones to take him. That the defendant was standing a few feet distant from where the Americans were standing, and Jones asked the defendant what he was doing, and the defendant did not say anything. The boy got away from Jones and Jones came over to the defendant and struck him with the revolver. The defendant yelled that he was dying and that Jones had shot him; and Jones fired another shot at him. That witness was afraid that Jones would kill everybody and he ran into the house.

The defendant, as a witness in his own behalf, testified, through an interpreter: That he was looking at what Mr. Jones was doing with the boy, and Mr. Jones hit him on the head with the revolver and he fell to the ground, and that was all he knew, except he had a feeling that he was shot in the side while lying there. That when he became conscious the doctor was caring for him.

Dr. J. F. Athie testified that he was a physician and surgeon; that he was called to attend the defendant and reached Solinsky's place about 30 mnutes after he was called, and found the defendant with a cut about three inches in length on the left side of the forehead which went through the scalp to the skull. Also a bullet wound in the left thigh. The scalp wound appeared to have been made by a round metallic instrument, and he sewed it up by putting in four or five

stitches; that the bullet passing through the thigh had ranged upward; that he treated him for about two weeks or more. He was asked:

"Q. What would be the probability of a blow of that kind being received, and a man walking around and not being unconscious as a result of that blow? A. He could walk around and might not know what he was doing?"

In rebuttal J. H. Potts testified that he was night watch at the smelter, and that it was after all the shooting was over that Tillie Solinsky came to the smelter office and phoned for a doctor; that he heard several shots. If a man would say 25 he would not dispute it, and the shooting did not last more than a half minute at the outside, with one shot about five minutes before.

No brief has been filed on behalf of the defendant, and we have not been favored with an oral argument in his behalf. The petition and motion for new trial allege that the instructions given by the court to the jury do not state the law applicable to the case.

It cannot be doubted that the issue of controlling influence upon the merits was whether the homicide was justifiable in self-defense. The instructions given by the court make no reference whatever to the law of justifiable homicide, as defined by section 2334, Rev. Laws, which provides that:

"Homicide is also justifiable when committed by any person in either of the following cases: First. When resisting any attempt to murder such person or to commit any felony upon him, or upon or in any dwelling house in which such person is. Or, second, when committed in the lawful defense of such person, or of his or her husband, wife, parent, child, master, mistress or servant, when there is a reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and imminent danger of such design being accomplished."

While it does not appear that such instructions were requested, nevertheless the defendant was entitled to have his case submitted to the jury on instructions fairly applicable to the evidence introduced in the case, including a correct

statement of the defendant's right of self-defense under the particular circumstances disclosed by the evidence.

Our Criminal Code (Comp. Laws 1909, sec. 6857, Rev. Laws, 5905), provides that:

"In charging the jury, the court must state to them all matters of law which it thinks necessary for their information in giving their verdict."

It was the duty of the court to charge the jury as to all the law applicable to every state of facts fairly supported by the evidence. It is apparent from the record that the court erred in charging the jury as complained of. Of course such a conviction cannot be sustained.

The evidence on the part of the state is remarkable, not for what the two deputy constables who went to the home of the defendant with the deceased say as to what their purpose was, but as to what they do not say. The one who was present when the brutal assault was made upon the defendant only attempts to justify it by saying the defendant was advancing upon the deceased.

Under the facts as disclosed by the evidence, we are inclined to think the deceased and his deputies, as peace officers, without a warrant or other process, were trespassers upon the premises of the defendant, as at most the evidence only tends to show a mere suspicion that some person had there committed a misdemeanor in their presence. The deceased, as a peace officer, was not justified in striking down and shooting at the defendant on his own premises, unless in necessary self-defense. *Sharp v. United States,* 6 Okla. Cr. 350, 118 Pac. 675. And there is no evidence tending to show that the deceased assaulted the defendant in the first instance in self-defense.

The only positive testimony as to how the assault was made is that of four witnesses who stated that it was unprovoked by the defendant in any way, and if the deceased was not a trespasser before the assault, he became a tres-

passer by his unlawful conduct, and the defendant then had the right to defend himself and to use all force necessary to resist further invasion of his home by the deceased and his deputies armed with deadly weapons.

It is undisputed that the deceased, as a constable, was not serving process, and no claim was made that he had reasonable cause to believe that any person there had committed a felony. In fact, there is an entire absence of any evidence as to what their purpose was in going upon the premises of the defendant, other than the naked unexplained statement that they were arresting a boy.

The state's testimony tended to show that the defendant, after the assault upon him, went into the house and armed himself with a shotgun and stood in his door, and that when the officers appeared on Conrad's porch he fired the first shot. It does not appear that the defendant admitted these facts, and, considering the circumstances in evidence, it might be a matter of some doubt as to whether or not the fatal shot was fired while the defendant was lying there unconscious.

The defendant and the people he lived with did not speak the English language. His testimony and the testimony of his witnesses, excepting Dr. Athie, was delivered in a foreign tongue and reached the jury only through the medium of an interpreter; and in that process the testimony on his behalf may have lost much of the fullness and force which ordinarily testimony derives by being transmitted directly to the court and the jury in their own language. However, it is undisputed that the deceased and his deputies appeared at the end of the porch next to the defendant's house with their guns presented, and that the several shots then fired were all within the space of a minute, and that the deceased and his deputies did shoot at and through the defendant's house, knowing at the time that persons other than the defendant, including women and children, were in the house. When there is an armed invasion on the premises or

habitation of another, and an assault is there made with a deadly weapon, the person assaulted may well assume that the other intends murder whether he does in fact or not, and if he kills his assailant he is justifiable.

A man has the right to defend his domicile against every unlawful invasion and to defend himself and those within it against every and all violence, without the necessity of retreat, even to the extent of taking life, if it be actually or apparently necessary to do so in order to prevent the commission of a felony thereon or therein. *Semayne's Case,* 3 Coke, 91; *Foster's Crown Cases,* 273; *Patten v. People,* 18 Mich. 314, 100 Am. Dec. 173; *State v. Patterson,* 45 Vt. 308, 12 Am. Rep. 200; *Stoneham v. Commonwealth,* 86 Va. 523, 10 S. E. 238; *Wright v. Commonwealth,* 85 Ky. 123, 2 S. W. 904; *State v. Taylor,* 143 Mo. 150, 44 S. W. 785; *Thompson v. State,* 61 Neb. 210, 85 N. W. 62, 87 Am. St. Rep. 453; *Beard v. United States,* 158 U. S. 550, 15 Sup. Ct. 962, 39 L. Ed. 1086; *Kirk v. Territory,* 10 Okla. 46, 60 Pac. 597; *Mahaffey v. Territory,* 11 Okla. 213, 66 Pac. 342; *Price v. State,* 1 Okla. Cr. 358, 98 Pac. 447.

Says Clark:

"It has become a maxim of the common law that a man's house is his castle, but this expression is not to be taken as meaning that a man may under any and all circumstances kill in defense of his dwelling house. A man is not bound to retreat from his house. He may stand his ground there and kill any person who attempts to commit a felony therein, or who attempts to enter by force for the purpose of committing a felony or of inflicting great bodily harm upon an inmate. In such a case the owner or any member of the family, or even a lodger in the house, may meet the intruder at the threshold and prevent him from entering by any means rendered necessary by the exigency, even to the taking of his life, and the homicide will be justifiable. The doctrine, however, does not justify a homicide merely to prevent a trespass upon the habitation, when it is evident that there is no intention to commit a felony or to inflict great bodily harm upon an inmate. Of course, in defending his

habitation, a man must act upon appearances, and if he acts in the *bona fide* and reasonable belief that the assailant intends a felony or great bodily harm to an inmate, and kills him to prevent his entry, the homicide is not criminal though he was mistaken as to the assailant's intention." (The Law of Crimes, Clark & Marshall, 2d Ed., 409.)

It is true that the authorities agree that the taking of life in defense of one's person, habitation, or property cannot be justified except upon the ground of necessity, actual or apparent, to prevent the commission of a felony on either, and that such necessity must be imminent at the time; and they also agree that no man can avail himself of such necessity if he brings it upon himself.

The law in its humanity will not justify the taking of life to repel a mere trespass or invasion of the home without felonious intent or in resisting a nonfelonious assault; but a man who is without fault may repel force with force in defense of his person, habitation, or property against any one or many who manifestly intend and endeavor with violence to commit a felony thereon or therein. In such case he is not compelled to retreat, but may pursue his adversary until he finds himself out of danger, and, if in the conflict between them he happens to kill him, such killing is justifiable.

The defendant being, where he had a right to be, on his own premises at the time the deceased assaulted him with a deadly weapon, and it being a disputed fact whether the defendant by his conduct in any way provoked the deceased to so assault him, the question was for the jury to determine as a question of fact upon all the evidence, and for this reason the court had no right in charging the jury to assume that the deceased, as a constable, and his deputies were not trespassers, and that the defendant was not without fault, or that the deceased, as such peace officer, was justified in making an assault with a deadly weapon upon the defendant. It also appears that there is no instruction limiting the force or defining the manner in which an arrest may be made by a peace officer without a warrant.

The court gave the following instruction:

"You are instructed that if you believe from the evidence in this case, beyond a reasonable doubt, that the deceased, W. H. Jones, was in the performance of his duties as a constable at the scene of the fatal encounter, and that he had arrested a person, whose name is not disclosed by the evidence in this case, for the commission of a misdemeanor in the presence of the deceased, and that the defendant, together with divers other persons, attempted to rescue said person, or to aid in his escape, and that the deceased struck the defendant with his revolver for the purpose of preventing such escape, and that the defendant, while in the possession of his faculties, and with the premeditated design to effect the death of the deceased, went to the house where he lived, procured a shotgun, came out of the house, and with the said shotgun shot and wounded the deceased, and that thereafter and on the 17th day of February, 1911, in Washington county, state of Oklahoma, the deceased died as a result of said shooting, then and in that event the defendant is guilty of the crime of murder, and the jury should so find."

Our Criminal Code provides by whom and how arrests may be made. The sections bearing on this case are as follows:

Section 5647, Rev. Laws:

"If the offense charged is a felony, the arrest may be made on any day, and at any time of the day or night. If it is a misdemeanor, the arrest cannot be made at night, unless upon the direction of the magistrate indorsed upon the warrant."

Section 5650: "The officer must inform the defendant that he acts under the authority of the warrant, and must also show the warrant if required."

Section 5654: "A peace officer may, without a warrant, arrest a person: First. For a public offense, committed or attempted in his presence. Second. When the person arrested has committed a felony, although not in his presence. Third. When a felony has in fact been committed, and he has reasonable cause for believing the person arrested to have committed it. Fourth. On a charge, made upon reasonable cause, of the commission of a felony by the party arrested."

Section 5655: "To make an arrest, as provided in the last section, the officer may break open an outer or inner door or

window of a dwelling house, if, after notice of his office and purpose, he be refused admittance."

Section 5656: "He may also at night, without a warrant, arrest any person who he has reasonable cause for believing to have committed a felony, and is justified in making the arrest though it afterward appear that the felony had not been committed."

Section 5657: "When arresting a person without a warrant, the officer must inform him of his authority and the cause of the arrest, except when he is in actual commission of a public offense, or is pursued immediately after an escape."

An arrest by a peace officer without a warrant for a public offense committed or attempted in his presence, made in substantial compliance with the terms of the statute, is a legal arrest, which no one can lawfully resist, and the officer may use whatever force is reasonably necessary to prevent an escape and secure the offender, but the officer must use no more force and violence than is reasonably necessary to secure the arrest. To make, or attempt to make, such an arrest in disregard or in violation of the provisions of the statute is an illegal act, which the person about to be arrested is not required to submit to.

The right to resist an unlawful arrest under provisions of the Dakota Code, identical with the provisions of our Code quoted above, is discussed in the case of *Bad Elk v. United States,* 177 U. S. 529, 2 Sup. Ct. 729, 44 L. Ed. 874, Mr. Justice Peckham, speaking for the court, said:

"The charge presented the plaintiff in error to the jury as one having no right to make any resistance to an arrest by these officers, although he had been guilty of no offense, and it gave the jury to understand that the officers, in making the attempt, had the right to use all necessary force to overcome any and all opposition that might be made to the arrest, even to the extent of killing the individual whom they desired to take into their custody. Instead of saying that plaintiff in error had the right to use such force as was absolutely necessary to resist an attempted illegal arrest, the jury were informed that the policeman had the right to use all necessary force to arrest him, and that he had no right to resist. He, of course, had no right to unnecessarily injure,

much less to kill, his assailant; but where the officer is killed in the course of the disorder which naturally accompanies an attempted arrest that is resisted, the law looks with very different eyes upon the transaction, when the officer had the right to make the arrest, from what it does if the officer had no such right. What might be murder in the first case might be nothing more than manslaughter in the other, or the facts might show that no offense had been committed."

In making an arrest without a warrant for a misdemeanor committed in the presence of the officer, the fact that such an offense was committed or attempted must exist to authorize the officer to act. In this case the evidence is insufficient. to show what offense, if any, was so committed or attempted.

In view of the conduct of the constable and his deputies in connection with the attempted arrest of another person on the premises of the defendant, it was the duty of the trial court to define, by proper instructions, the manner of making a lawful arrest. and the force that might be used in so making or in resisting an attempted rescue, if an arrest was made. Admitting that the violence employed by the deceased did not justify the shooting by the defendant, we think that the question of the defendant's guilt of the crime of murder should not have been submitted to the jury. The issue upon the evidence is manslaughter or justifiable or excusable homicide. However, we do not say that the facts in evidence show that the defendant was justified in self-defense or in defense of his habitation in shooting the deceased; that was a question for the jury to determine under proper instructions; and these are the principles of law which, on the defendant's theory of the case, should have. been given in the charge to the jury.

From our examination of the record, it clearly appears that the case was tried and submitted to the jury upon an erroneous theory of the law prejudicial to the substantial rights of the defendant, and we are unable to say that the de-

fendant has had that fair and impartial trial which the law guarantees to him.

For the reasons herein stated, the judgment of the district court of Washington county is reversed, and the case remanded to that court for further proceedings not inconsistent with the views expressed in this opinion. The warden of the penitentiary will surrender the defendant to the sheriff of Washington county, who will hold him in custody until he shall be discharged or as otherwise ordered according to law.

ARMSTRONG, P. J., and FURMAN, J., concur.