# GROVER ARMSTRONG v. STATE.

No. A-1935.    Opinion Filed November 5, 1914.

(143 Pac. 870.)

1.  **HOMICIDE—Right to Defend Domicile—Extent.**  A man has the
    right to defend his domicile against every unlawful invasion
    and to defend himself and those within it against every and all
    violence, without the necessity of retreat, even to the extent
    of taking life, if it be actually or apparently necessary to do
    so in order to prevent the commission of a felony thereon or therein.

2.  **SAME.**  ''A man's house, however humble, is his castle; and
    his castle he is entitled to protect against invasion;'' and a
    man in his own habitation has a right to resist force with force
    and repel the entrance against his will of one who in a violent
    manner attempts to enter for the manifest purpose of assaulting
    or offering violence to him, or to inmates under his protecting
    care, even to the extent of taking life, if it be actually or
    apparently necessary to do so in order to prevent such un-
    lawful entrance.

(Syllabus by the Court.)

*Appeal from District Court, Texas County;*
*R. H. Loofbourrow, Judge.*

Grover Armstrong was convicted of manslaughter in the
first degree, and appeals.   Reversed.

*Harris & Breslin, M. G. Wiley,* and *J. O. Lynch,* for plain-
tiff in error.

*Chas. West,* Atty. Gen., and *Smith C. Matson,* Asst. Atty.
Gen., for the State.

DOYLE, J.   This appeal is prosecuted from a judgment
and sentence rendered on the 20th day of November, 1912, in ac-
cordance with the verdict of the jury, finding the defendant,
Grover Armstrong, guilty of manslaughter in the first degree,
and assessing his punishment at imprisonment in the peniten-
tiary for the term of four years.

Upon the trial it appeared: That the defendant, Grover Arm-
strong, at the time of the commission of the homicide, was living
at the home of his brother, Ed Armstrong, in the south central
part of Texas county, about 30 miles from the town of Tex-

homa, and about 40 miles from Guymon, the county seat. The deceased, Elmer Pendergraft, resided in the same community at a distance of about one and one-half miles from the Armstrong home. On the night of November 6, 1911, the defendant shot and killed Elmer Pendergraft near the home of Ed Armstrong, who was at that time on a visit with his father and mother in Logan county. At the time there were at the home of Ed Armstrong his wife and their three children, the eldest being a little girl about nine years of age, and the defendant. The Armstrong family lived in what is known as a half dugout. The front entrance had two doors; one a trap or drop door that lifted up with a pulley arrangement, and one at the foot of the steps that opened into the house proper. That on Friday, November 3d, the defendant left home and went to the town of Texhoma, returning the next day. That upon his arrival home Mrs. Armstrong told him that Elmer Pendergraft had been there Friday night and had raped her, and had threatened to kill the whole family if she told any one. That Mrs. Armstrong advised her husband by letter of the outrage that had been committed on her. That on the night of November 6th, about 9 o'clock, the deceased came to the Armstrong home on horseback. When he reached the dugout he made his presence known by hallooing, and then opened the outer door of the dugout. Mrs. Armstrong recognized his voice, and told him to leave or go away. The defendant picked up a double barrel shotgun, and, standing in the door at the foot of the steps, asked the deceased what he was doing there. The deceased replied: "What! you here, you God damn son of bitch, I will fix you." As he said this he threw up his arm. The defendant fired a shot, and, stepping upon the steps, fired the gun again. Mrs. Armstrong and her three little girls and the defendant climbed out of a window and went to the home of a neighbor and reported the shooting. The body of the deceased was found the next morning near the dugout. One load of shot had entered the left breast, except two shot entering the left forearm. Both wounds ranged upward.

From a careful examination of the record the conclusion of the court is that the judgment in this case must be reversed. Of the 50 assignments of error we will notice only those which in the new trial granted will be liable to arise again. Several assignments of error refer to the rulings of the trial court in sustaining the objections to evidence offered by the defendant. Mrs. Clara Armstrong, as a witness for the defendant, testified to the circumstances of the shooting. She was then asked the following questions:

"I will ask you what, if any, circumstances between yourself and Mr. Pendergraft happened on the night of November 3, 1911? (Objection sustained.) Q. Did you see Elmer Pendergraft on the night of November 3d at your home? A. Yes, sir. Q. I will ask you if on the night of November 3, 1911, the deceased, Mr. Pendergraft, came to your house, and by force and with a revolver ravished you? (Objection sustained.) Q. Did you communicate the fact of this ravishment, if there was one, which has been excluded by the court, to your brother-in-law, the defendant? (Objection sustained.) Q. Did you, at any time, tell Grover Armstrong, in a conversation which you and he had about the outrage that this deceased had committed upon you on November 3, 1911? A. Yes, sir.

"Mr. Mr. Gleason: Object to the question as incompetent, irrelevant, and immaterial and no proper foundation laid, and ask that the answer be stricken out.

"By the Court: Objection sustained, and the jury will not regard the answer."

Thereupon the court directed the jury to retire, and the following offer of proof was made:

"Here the defendant offers to prove by the witness, Mrs. Clara Armstrong, that on the night of November 3d, previous to the homicide which is alleged in the information in this case, that the deceased came to the house of Mrs. Armstrong, who is a sister-in-law of the defendant, and where the defendant resided, and was the only male person residing at that place, and that the deceased entered the house with a revolver while the defendant was absent; that at the point of a revolver, and with threats of the life of herself and her family and the life of this defendant should she ever tell it, he forced her to allow him to have sexual intercourse with her; that he ravished her, and that upon the returning home of this defendant this witness, Clara Armstrong, communicated these threats to this de-

fendant; that the defendant returned to his home, which was the home of this witness and that of his brother, Saturday, November 4th; that immediately upon his return, which had been the first time she had seen him since the said ravishment occurred, she communicated these facts to the defendant in this case; that thereupon the defendant procured a shotgun and loaded it.

"By the Court: The objection to the offer is sustained."

The defendant as a witness in his own behalf testified to the circumstances of the shooting. The record is then as follows:

"Q. I will ask you to state to the jury what was the occasion of you having your gun at that time, and what did you shoot for? (The state objects.)

"By the Court: You may answer that question, but in answering it you will not repeat conversations you had with other persons than the deceased."

An exception was taken. The court directed the jury to retire, and the following offer of proof was made:

"The defendant offers to prove that on the night of the 3d day of November, 1911, that the deceased came to the house of Ed Armstrong, and there at that time forcibly assaulted his wife and forced her, under a threat with a gun, to have sexual intercourse with him; that when the defendant came home on Saturday evening Mrs. Armstrong cried, and told him of the assault which had been made upon her, and what she had been forced to do in order to save the lives of herself and her children. The defendant further offers to prove that, thinking and believing that the deceased intended to carry out his threat, he got a shotgun; that on Monday night when the deceased did come back he was warned to leave the premises by the defendant; that he refused to do so, and when the doors were opened to the place of residence, which was a dugout, that the deceased threatened then and there to fix or impliedly to kill the whole outfit, as he had formerly threatened to do to the wife of Ed Armstrong if she told of his treachery. The defendant further offers to prove by this witness that on Saturday afternoon, November 4, 1911, Mrs. Ed Armstrong communicated to this defendant a certain threat made by the deceased toward this defendant and herself, in substance as follows: That if she (Mrs. Armstrong) told of his (Pendergraft's) having ravished her on the Friday night previous, that he (Pendergraft) would kill the whole damn outfit. (The state objects.) By the Court: The objections to the offer are sustained."

After cross-examination on redirect examination, the defendant was asked the following question:

"Q. You knew he had ravished your sister-in-law at that time, didn't you? A. Yes, sir.

"By the County Attorney: Objected to as incompetent, irrelevant, and immaterial, and we don't think it is proper to keep asking these questions.

"By the Court: Objection sustained, and the jury will not regard the answer, and counsel will not pursue a course that I have sustained objections to."

After the state and the defendant had rested, the court took a recess to prepare the instructions. Thereafter when court convened the court said:

"Gentlemen, in this case, after considering the matter, I have concluded that I ought to permit the case to be reopened and the defense to offer, or to prove, rather, any threats that were made and communicated to Mr. Armstrong."

Thereupon the defendant was recalled as a witness in his own behalf, and testified that he left home on Friday about 11 o'clock, and went to Texhoma, and returned Saturday evening about 5 o'clock. His further testimony is as follows:

"Q. At that time did your sister-in-law communicate to you anything that had been said by the deceased in the way of a threat against you or her or the family? (Objection overruled.) A. She said that on the night before—

"By Mr. Gleason: I think the witness ought to be cautioned to confine himself to what was said in the nature of threats.

"By the Court: You can prove any threats that he made against him.

"By Mr. Wiley: Does the court hold that I cannot prove any threats against the family, which was immediately in his custody? We have an express statute on it.

"By the Court: I know, but you will have to come within the terms of that statute in other respects. If you will limit that matter simply to threats, you can go ahead; you know what I don't want to come in.

"A. Well, she said that he was there the night before and threatened to kill her and the whole family.

"By Mr. Wiley: If the court please at this time we would insist on the other matter which was ruled out, but I understand the court has not changed his ruling on that matter.

"By the Court: Yes, that is correct; I have not changed my mind on that."

Mrs. Clara Armstrong, being recalled, testified as follows:

"Q. I will ask you, when Grover Armstrong came home on Saturday evening, whether or not you communicated to him any threat that had been made by the deceased? A. Yes, sir; I did. Q. What did you tell him? A. I told him that he had been there and ravished me, and threatened me under a gun that he would take my life and all the rest of us if I ever told it.

"By Mr. Gleason: I move that the witness' testimony be stricken out as incompetent, irrelevant, and immaterial, and hearsay, and no foundation laid.

"By the Court· I will let the answer remain in the record the way it is."

The question is: Was the evidence offered and excluded by the court competent and admissible as an element of the defense? The Attorney General does not defend the rulings of the court, but contends that, if there had been any previous errors committed by the trial court in this regard, the same were cured by the admission of this testimony when the court reopened the case.

We think that the evidence offered was competent and admissible, and that its exclusion by the court constituted reversible error, and we cannot agree with the contention that the error in the exclusion of such evidence was cured by the testimony admitted after the case had been reopened. The right of a man to defend his domicile against every unlawful invasion and to defend himself and those within it against every and all violence without the necessity of retreat, even to the extent of taking life, if it be actually or apparently necessary to do so in order to prevent the commission of a felony thereon or therein, has been clearly defined by the statute.

It is provided in the Penal Code (section 2334, Rev. Laws 1910):

"Homicide is also justifiable when committed by any person in either of the following cases:

"First. When resisting any attempt to murder such person, or to commit any felony upon him, or upon or in any dwelling house in which such person is; or,

"Second. When committed in the lawful defense of such person, or of his or her husband, wife, parent, child, master, mistress or servant, when there is a reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and imminent danger of such design being accomplished; or,

"Third. When necessarily committed in attempting, by lawful ways and means, to apprehend any person for any felony committed; or in lawfully suppressing any riot; or in lawfully keeping and preserving the peace."

In *Collegenia v. State,* 9 Okla. Cr. 425, 132 Pac. 375, the court, construing the foregoing section, said:

"The law in its humanity will not justify the taking of life to repel a mere trespass, or invasion of the home without felonious intent or in resisting a nonfelonious assault; but a man who is without fault may repel force with force in defense of his person, habitation, or property against any one or many who manifestly intend and endeavor with violence to commit a felony thereon or therein. In such case he is not compelled to retreat, but may pursue his adversary until he finds himself out of danger, and if in the conflict between them he happens to kill him, such killing is justifiable."

Upon the admitted facts in the Collegenia case, it was unnecessary to determine the precise limit of the domiciliary right. We think the general rule is that a person within his dwelling house may use such means as are absolutely necessary to repel an assailant or prevent his forcible entry, even to the taking of life.

Another provision of the Penal Code (section 2342 of Rev. Laws 1910) is as follows:

"To use or attempt to offer to use force or violence upon or toward the person of another is not unlawful in the following cases:

"First.   *   *   *

"Second.   *   *   *

"Third.   When committed either by the party about to be injured, or by another person in his aid or defense, in preventing or attempting to prevent an offense against his person, or any trespass or other unlawful interference with real or personal property in his lawful possession; provided the force or violence used is not more than sufficient to prevent such offense."

Says Wharton:

"An attack on a house or its inmates may be resisted by taking life. * * * (3) Aside from these two grounds, which may be also regarded as included in the right of prevention of felonies, the occupant of a house has a right to resist, even to the death, the entrance of persons attempting to force themselves into it against his will, when no action less than killing is sufficient to defend the house from entrance; and even the killing of an officer of the law, known to be such, endeavoring thus to intrude, is not murder, but manslaughter. A man's house, however humble, is his castle; and his castle he is entitled to protect against invasion. The rule is to be traced to old times when the peace of the body politic, as well as of individuals, depended upon the maintenance of the inviolability of houses as castles. And the rule continues to exist when there is an equal reason for the maintenance of the inviolability of houses as homes." (1 Wharton Crim. Law [10th Ed.] par. 503.)

See, also, 1 Bishop's New Cr. Law, sec. 858.

A man in his own habitation may resist force with force, and repel the entrance against his will of one who in a violent manner attempts to enter for the manifest purpose of assaulting or offering violence to him or to inmates under his protecting care, even to the extent of taking life, if it be actually or apparently necessary to do so in order to prevent such unlawful entrance.

The evidence excluded was competent and admissible for the purpose of showing that the defendant had reasonable ground of apprehension of imminent personal injury, not only to himself, but to those within his habitation, and evidence that the deceased had a few nights before invaded the defendant's home, armed with a deadly weapon, and had committed a felonious assault upon an inmate, would tend to the conclusion that the defendant, when he fired the fatal shot, knew, or had reason to believe, that the killing was necessary, not only to defend himself against loss of life or great bodily harm, but also to prevent an unlawful entrance into his habitation, and thereby defend those within it against loss of life or some great personal injury, and for this reason the evidence offered should have been admitted, and the exclusion of the same must have

necessarily operated to deprive the defendant of a fair determination regarding his guilt or innocence.

We do not deem it necessary to consider in detail the numerous assignments predicated upon instructions given and refused, further than to say that in the instructions given the court ignored all distinctions between a homicide committed in self-defense in a public place where both parties have equal right, and a homicide committed by a person in his own habitation to prevent an unlawful entrance against his will, with a purpose of assaulting or offering personal violence to him or to other inmates of his home.

Accordingly the instructions given by the court limited the defense to self-defense alone, and the jury were instructed that, in order to justify the killing, the defendant must in good faith have believed that the killing was necessary either to preserve his own life, or prevent his receiving great bodily harm. The defendant requested the court to give instructions on the right of defense by a person in his own habitation and the right to defend his habitation from unlawful entry and the right to defend the persons within against an assailant. The court refused to give the requested instructions.

It is our opinion that the trial court, in rejecting the evidence offered, and in refusing to give requested instructions, denied to the defendant the right to have a jury, properly instructed as to the law, say by their verdict whether he went further than the law justified in defending his habitation against a forcible and unlawful entrance, and in the necessary protection of its inmates.

A careful review of the record impels the conclusion that the conviction in this case was the result of the erroneous rulings of the court. The judgment of conviction must therefore be reversed, and the case remanded to the district court of Texas county for further proceedings not inconsistent with the views expressed in this opinion.

ARMSTRONG, P. J., and FURMAN, J., concur.