ARTHUR FANNING v. STATE.

No. A-4171.   Opinion Filed Dec. 31, 1923.
Rehearing Denied April 12, 1924.
(224 Pac. 359.)

(Syllabus.)

1.   **Homicide—Propriety of Instruction that Self-Defense not Available to One Provoking Assault.** In a homicide case, where none of the several belligerent parties were trespassers, and all at the beginning of the affray were in a place where they had a right to be, an ordinary instruction that one provoking a fatal assault cannot invoke the right of self-defense is proper.

(a) Such an instruction should be qualified, where the doing of a lawful act provoked the difficulty, when the evidence warrants such qualification.

2.    Homicide—Instruction as to Real or Apparent Danger Suffi-
      cient. An instruction relating to real or apparent danger ex-
      amined, and held sufficient.

3.    Trial—Use of Word "Slayer" Instead of "Assailant" in Instruc-
      tion on Self-Defense Immaterial. The use of the word "slay-
      er" instead of the word "assailant" held immaterial under the
      facts proved, considered with the other instructions given.

4.    Same—Instruction on Self-Defense Held not to Deprive Ac-
      cused of Benefit of Lawful Conduct of Those Acting with Him.
      The instruction admonishing the jury that if they found that
      the accused alone, or in concert with others, and not in his
      own self-defense, was responsible for the homicide, considered
      with the other instructions given, did not deprive the accused
      of the benefit of the lawful conduct of those acting with him.

Appeal from District Court, Canadian County; Jas. I.
Phelps, Judge.

Arthur Fanning was convicted of manslaughter in the
first degree, and he appeals. Affirmed.

J. I. Howard and A. M. Beets, for plaintiff in error.

The Attorney General and N. W. Gore, Asst. Atty. Gen.,
for the State.

BESSEY, J. Arthur Fanning, plaintiff in error, here
designated the defendant, was on the 11th day of June,
1921, in the district court of Canadian county, convicted of
the crime of manslaughter in the first degree, for the death
of Garnett Barker on December 24, 1920. His punishment
was fixed at confinement in the state penitentiary for a term
7 years. From the judgment rendered on the verdict, he
appeals to this court.

The record in this case is voluminous, comprising more
than 1,000 typewritten pages. Both sides were represented
by able counsel, and, considering the number of persons in-
volved in the difficulty out of which this tragedy grew, and
the complex attending circumstances, the record is singularly
free from error. The only complaint urged by the defendant
is that the instructions of the court were insufficient and
misleading.

In order that this assignment of error may be comprehended it will be necessary to make a statement of the testimony at some length. This homicide and the death of Elmer Fanning at the same time were the culmination of ill feeling between Garnett Barker and his father, Beverly Barker, and their friends and employes on the one side, and the defendant and his brother, Clint Fanning, and their friends and employes on the other side. At and near the scene of the homicide there were 7 men, armed with various kinds of weapons, among which were 3 shotguns, 2 or more pistols, and a double-bitted ax. Garnett Barker and Beverly Barker, his father, lived on farms adjacent to lands leased and cultivated by the defendant and his brother, Clint Fanning, located between two Barker farms. On this leased land there was about 30 acres of standing corn then being harvested by the Fannings, assisted by three neighbors. One-third of the corn so harvested was to be delivered to one of the Barkers on the Barker premises. The one to whom this rent portion originally belonged had transferred his interest to the other Barker shortly before harvest time. During the crop season the Barkers and their employes passed back and forth by and through the Fanning cornfield, sometimes going through the field and sometimes skirting it on either side.

During the crop season and before the corn was gathered some stock had broken into the cornfield and eaten or destroyed some of the corn. There was some question as to whether Beverly Barker or the defendant, Fanning, was responsible for the trespass of the stock in the corn. In any event some controversy arose between the parties with reference to that portion of the crop so destroyed. That matter had been adjusted between the parties, and no further trouble was had between them until about the 21st or 22d of December, 1920, two or three days before the homicide. At that time Garnett Barker, accompanied by a hired hand, Tom

Womack, and Louis Barker, a cousin, came through the cornfield where the defendant was shucking corn. Garnett Barker had an ax with him, and it is claimed by the defendant and his witnesses that the deceased threatened to chop the the defendant up with this ax; that, however, was denied by the other witnesses accompanying the deceased at that time.

On the night of the 23d of December, the night before the homicide, the defendant sent his brother, Clint Fanning, over to the home of Ed and Dave La Follette, who lived about a mile southeast of Arthur Fanning's residence, to employ the two La Follettes to help shuck corn the next day, in order that the shucking might be finished before Christmas. At that time Arthur Fanning's father, T. E. Fanning, was living about 20 miles east of the home of Arthur Fanning, and, as Arthur Fanning was preparing to leave the Barker neighborhood as soon as the corn crop was gathered, he had been hauling his part of the corn crop to his father's place. On the day before the homicide he had returned from his father's, where he had delivered a load of the corn, accompanied by his brother-in-law, a Mr. Phillips, and by his brother, Elmer Fanning, who was badly crippled and unable to perform manual labor.

On the morning that the homicide occurred, after the chores had been done by Garnett Barker, Louis Barker, and Tom Womack, they were ready to leave and go back to Beverly Barker's about 10 o'clock. Garnett Barker went out and procured a stick which he measured and cut to the length of 26 inches, with the avowed intention of measuring the wagon box of the defendant, Arthur Fanning. He also procured a .38 special Colt's revolver which he owned, and asked his wife where the shells for the revolver were kept. She refused to disclose their whereabouts to him, and urged him not to take his gun with him. He replied that he was

going to take the gun with him for protection, and that he was going to protect himself. His wife still refusing to show him where the shells were, he made a search for them and found them in another house some distance from the main residence. He loaded his revolver and put two or three of the shells in his pocket. Then either the deceased himself, or one of the parties with him, procured a double-bitted ax, and with these weapons and the 26-inch stick the deceased, Tom Womack, and Louis Barker left the home of the deceased and started for the home of Beverly Barker, passing through the Fanning cornfield.

At about this time Clint Fanning, brother of the defendant had left the cornfield with Ed La Follette's wagon loaded with corn to take the same to the home of Garnett Barker, as part of his share of the crop. He was accompanied by Elmer Fanning, the crippled brother. When the deceased, Garnett Barker, was some 75 or 100 yards north of the road he or his companion saw Clint Fanning coming down the road with the load of corn, and the deceased and his companion turned and walked back down to the road, where they met Clint and Elmer Fanning. Some conversation occurred there, the substance of which was that the deceased asked Clint Fanning when they would finish, and he stated he thought they would finish by noon, or in time to get home for Christmas. Then the deceased gave some directions about putting a board across the window of the crib to keep the corn from rolling out, and with his companion started up the road in the opposite direction from which Clint Fanning had come.

At this time Garnett Barker was armed with the .38 caliber revolver. After he and his companion had proceeded up the road perhaps 100 yards, according to the evidence, Elmer Fanning, the crippled brother, asked Clint if he saw

the gun in Barker's pocket, and Clint stated that he did. Without saying anything further Elmer Fanning got off the wagon and started back up the road following the deceased and his two companions.

At this time 17 or 18 rows of corn remained to be gathered; the rows being less than a quarter of a mile long. Arthur Fanning was shucking corn at the south end of the rows and just north of the road; Dave La Follette was shucking about 100 yards north and along the west side of the cornfield; Ed La Follette, his brother, was shucking almost opposite him on the other side of the corn row—each shucking north, one being right-handed and the other left. The deceased, Garnett Barker, continued up the road to the east until he came to the wagon where Arthur Fanning was shucking corn. There was some talk between the two men at Fanning's wagon, in which Barker asked Fanning when they would finish, and Fanning stated that he did not know. Barker asked him if he had any idea and he said, "Not a bit," some of the witnesses testifying that he said, "Not a damn bit." Barker then remarked that that was rather a short way to answer a man, and Fanning said that was the way he ought to be answered on account of the way he had talked to him a few days before. Barker then remarked, "If that is the way you feel about it, let it go," and he and his companions started on north in the cornfield in the direction of where the La Follettes were shucking corn.

When Garnett Barker, Tom Womack, and Louis Barker reached the point where the La Follettes were shucking corn, some greetings were had and almost immediately Ed La Follette and Tom Womack engaged in a fist fight over some grievance, real or fancied, on the part of Ed La Follette against Tom Womack. At that time the others present, Garnett Barker, Dave La Follette, and Louis Barker, did not

take any part in the fight. Ed La Follette was getting the best of the fight, and Tom Womack started running up the the hill. The La Follettes testified that Garnett Barker then told Womack in substance that he need not run and to stay and fight if he wanted to, as nobody was afraid; that about the time Womack started to run away Dave La Follette asked the deceased what he had been saying to Arthur Fanning about them. Barker replied, "Nothing," and asked who said that he had. Dave La Follette said that Arthur Fanning had, and Barker answered that Fanning was a liar.

There were four eyewitnesses to the homicide, in addition to Beverly Barker, who claimed to have been a witness; the witnesses being Tom Womack, Louis Barker, Ed and Dave La Follette. Arthur Fanning had a 12 gauge shotgun in his wagon; Ed La Follette had a double-barreled shotgun in his wagon;, and Clint Fanning had one in his wagon—the various witnesses testifying that it was their practice to carry these shotguns during the corn gathering season for the purpose of killing rabbits, quail, or other game that they might run across.

During the fight between Tom Womack and Ed La Follette and the controversy between Dave La Follette and Garnett Barker, Arthur Fanning had walked up from where he was shucking corn, carrying his shotgun in his right hand, grasped near the center. When he reached the scene of the trouble the evidence is somewhat contradictory as to just what occurred, but Arthur Fanning ordered Garnett Barker off the premises, and Barker accused him of drawing a gun on him. The evidence is somewhat conflicting as to just what was said, but, analyzed most favorably to the defendant, it is to the effect that Fanning handed the gun to Dave La Follette, who was standing near him, and that Dave La Follette set it over against Ed La Follette's wagon.

The witnesses all agree that the shooting then commenced almost immediately. Elmer Fanning, the crippled brother, who had gotten off the wagon of Clint Fanning, had come up at that time, but no witness testified to having seen Elmer Fanning until he was on the scene of the trouble and just behind the defendant, Arthur Fanning. In any event the shooting started, the state's witnesses testifying that Elmer Fanning fired the first shot, being followed almost immediately by a shot from Garnett Barker; and the witnesses for the defendant testifying that Garnett Barker shot first and that Elmer Fanning shot almost immediately following and about the time that Garnett Barker fired the second shot. After that the shooting was fast and furious, so that it is hard to determine who fired each shot and the order in which the different shots were fired. Garnett Barker was shooting a .38 Colt's special double-action gun; Elmer Fanning was shooting a .32 Colt's on a .45 frame, single-action, but he shot almost as fast as Garnett Barker, as he held the gun in one hand and knocked the hammer back with the other hand. Near the close of the shooting Arthur Fanning fired the shotgun, striking Garnett Barker in the shoulder, but not inflicting a fatal wound—the evidence of all the parties showing that the bullet from Elmer Fanning's pistol caused Barker's death. As the shooting between Garnett Barker and Elmer Fanning proceeded, Barker advanced towards Elmer, and they both dropped about the same time; Barker dying almost immediately, and Fanning about an hour thereafter.

The shotgun wound inflicted by the defendant was not a fatal wound, but the state claims that defendant was acting in concert with and in law was a principal with his deceased brother, who fired the fatal shot that killed Garnett Barker at about the same time that he (Elmer Fanning) fell mortally wounded by a shot fired by deceased.

Defendant claimed justification on the grounds of self-defense, and urges that under the facts as shown in evidence the court erred in his instructions to the jury on that issue. Particular complaint is made of instruction No. 13, which was as follows:

"You are further instructed that the definition which the court has given you for justifiable homicide presents for your consideration what is termed the law of self-defense, and in this connection you are instructed that a person who, without having sought the difficulty and without having voluntarily entered into it, is assaulted or threatened with an immediate assault by another, with such means and under such circumstances as would cause a reasonable person in like situation to believe that he was in danger of being killed or of receiving great bodily injury at the hands of the other, has the right for the preservation of his own safety to use such force and violence upon his assailant as would reasonably appear to the slayer to be necessary to avert the threatened danger, even if it involves the taking of human life. And in such case, if the assaulted person is in a place where he has a right to be and the danger is not of his own seeking or willfully provoked by him he is not required to flee from it, but he may resist it with adequate and necessary force until he is safe.

"The law of self-defense, however, is emphatically a law of necessity; it does not imply the right of attack, and cannot avail in any case where the difficulty is sought for or induced by the slayer by any willful act of his own, or where he voluntarily enters into it, or of his own free will enters into it, no matter how hard he may be pressed or how great his danger may become during the progress of the difficulty, unless he in good faith abandons the contest and either by word or act makes that fact known to his adversary. If, however, the original aggressor does in good faith abandon the contest and does by word or act make that fact known to his adversary, and if thereafter his adversary continues the combat, then such adversary himself becomes an aggressor and thereafter the original aggressor has the right of self-defense.

"A homicide is not justified on the grounds of self-defense, however, unless it is actually or apparently necessary to save the life of the slayer, or to prevent his receiving some great bodily injury at the hands of the deceased. The apprehension of no other danger will justify the resort to so extreme a measure as the taking of human life.

"It is not necessary, however, to the plea of self-defense that the slayer's danger shall be actual or real; all that is necessary is that the slayer, from his standpoint, under all the facts and circumstances then existing or by him honestly believed to be true, has reasonable cause to believe and does believe that he is in such pressing danger. The slayer's belief of that fact, however, must be a reasonable one; that is, he must have reasonable cause for such belief, and such belief, however honest it may be, if the facts and circumstances then existing and known to the slayer or honestly believed by him to be true, furnish no reasonable cause would constitute no justification for a homicide; for men do not hold their lives subject to the unreasonable fears or excessive caution of others.

"A reasonable cause for such belief is such an overt act or demonstration made by the deceased at the time of the shooting as, considered in the light of all the facts and circumstances then existing and known to the slayer, or by him believed to be true, would create in the mind of a reasonably prudent person in like situation an honest belief that the deceased then and there intended to kill him or inflict great bodily injury upon him, and that it was necessary to kill the deceased in order to avert such threatened danger to himself. What acts or demonstrations do or do not constitute such reasonable cause and whether or not any were made are questions of fact to be determined by the jury, upon a consideration of all the facts and circumstances in evidence before you. And, in this connection, you are instructed that if you believe from the evidence in this case beyond a reasonable doubt that the defendant, Arthur Fanning, acting alone or in connection with Elmer Fanning, Dave La Follette, and Ed La Follette, or either of them, said defendant participating therein, shot the said Garnett L. Barker and thereby kill-

ed him, but should further believe that the deceased, Garnett L. Barker, without the defendant, Arthur Fanning, having sought the difficulty or having voluntarily entered into it or having willfully provoked it, assaulted the defendent or attempted to assault the defendent in such manner and under such circumstances as would cause a reasonable person, situated as was the defendant at that time, to honestly believe that he was in immediate danger of being killed or of receiving great bodily injury at the hands of the deceased, and that the defendant under such circumstances, for the purpose of averting such apprehended injury to himself and not in the spirit of malice or revenge, inflicted the fatal wound upon the deceased, having reasonable cause to believe and honestly believing that it was necessary to him to act for the preservation of his own safety, then and in that event the killing would be justifiable, and it would be your duty to acquit the defendant.''

Defendant earnestly contends, at great length, that this instruction is faulty because it fails to define, as a matter of law, when and under what circumstances the defendant, under the evidence, would be at a place where he had a right to be; and that the question of provoking the difficulty was incorrectly stated. Defendant says the language used, ''You are instructed that a person who, without having sought a difficulty and without having willfully provoked it, or voluntarily entered it, is threatened with immediate assault,'' has certain rights, etc., would be appropriate if the evidence in the case disclosed that the defendant, with an intent and purpose and with a premeditated design to take the life of Garnett Barker, willfully and unlawfully entered into a controversy with him and provoked a difficulty for the purpose of consummating that design; that Arthur Fanning ordered the deceased to leave the premises and stop the fussing, and that he had a right to do this and had a right to use such force as was necessary to accomplish that purpose, so long as it did not amount to the taking of human life or inflicting serious

bodily harm upon the trespasser. Defendant claims that by this instruction the court not only deprived him of the benefit of any good intent he might have had in going to the scene of this difficulty, but did not tell the jury what his actual rights were. In support of this contention defendant cites the holdings of this court in the cases of Gibbons v. Territory, 5 Okla. Cr. 212, 115 Pac. 129, and Turnbull v. State, 8 Okla. Cr. 465, 128 Pac. 743.

It may be conceded that an ordinary instruction to the effect that one provoking a difficulty cannot invoke the plea of self-defense might be erroneous, where the doing of a lawful act provoked violence on the part of another. In such case the lawful provoking of another might not operate to deprive the aggressor of his right to self-defense, but, as we analyze the testimony before us, this is not such a case. The facts here indicate that this was in a large measure a mutual combat, where all of the parties were armed and in a belligerent state of mind, ready and willing to resort to violence, and that the combatants on both sides were acting in concert with others. We think to have instructed the jury as requested upon this point, under the facts here, would have amounted to a comment upon the weight of the evidence—a vice to be avoided.

While it is the duty of the trial court to give instructions upon every clean-cut issue of law, such courts will not be required to give instructions on speculative theories of law that may be deduced from some collateral phase of the testimony. To do so would in many instances tend to confuse rather than enlighten the jury upon the real, substantial issues involved. We think the instruction as given, standing alone and in connection with the other instructions given, fairly stated the law as applied to the evidence.

The case of Gibbons v. Territory, supra, is not in point, because there the accused was an officer, on trial for murder growing out of an effort to discharge an official duty, under which circumstances an ordinary instruction that one who provokes a difficulty will be deprived of his right to plead self-defense would not be a true statement of the law. The situation in that case was entirely different from that disclosed by the facts here, where all of the parties originally were at a place where they had a right to be, and the right of self-defense, if any there was, grew out of subsequent happenings. And the case of Turnbull v. State was one in which the assault grew out of a lawful act of the accused, and the court instructed the jury that, if they believed that the accused provoked the violence or brought it on by any willful act of his own, then they were not authorized to acquit him. Under the circumstances there the phrase should have read "by any unlawful act of his own" because the provoking of a difficulty by a lawful act would not deprive one of the right to invoke the plea of self-defense. The language used in the instruction here under consideration related to a different state of facts and is of different import.

It is urged that the court should have instructed the jury, defining as a matter of law under what circumstances the defendant is in a place where he has a right to be. Under the facts as shown in evidence we see no necessity for such an instruction. The defendant and those assisting him in shucking corn had a right to be where they were; the landlord and those employed by him were rightfully there to see that a proper division of the crop was made and to instruct the tenant as to the disposition of the landlord's portion of the grain. The jury knew all this. That fact was so apparent that it was not, in our judgment, necessary to elaborate upon that phase of the evidence. The question of trespass

was not involved, as in the following cases cited by defendant: Dickinson v. State, 3 Okla. Cr. 151, 104 Pac. 923; Collegenia v. State, 9 Okla. Cr. 425, 132 Pac. 375; Armstrong v. State, 11 Okla. Cr. 159, 143 Pac. 870; Swan v. State, 13 Okla. Cr. 546, 165 Pac. 627.

The case of Brandley v. State, cited by defendant (14 Okla. Cr. 479, 173 Pac. 661), is not in point because in the instruction there given what was said about the defendant's right to be where he was when the difficulty arose was couched in terms calculated to lead the jury to believe that the defendant was a trespasser, when as a matter of fact he had a right to be there, which is not true of the language used here.

It is further urged that this instruction is faulty because it nowhere tells the jury that they "must place themselves in the position of the defendant and view the situation from his standpoint." We think the following language used by the court is equivalent in meaning:

"It is not necessary, however, to the plea of self-defense that the slayer's danger shall be actual or real; all that is necessary is that the slayer, from his standpoint, under all the facts and circumstances then existing or by him honestly believed to be true, has reasonable cause to believe that he is in such pressing danger."

Defendant also complains that the word "slayer" was improperly used, for the reason that the evidence shows that the shot fired by the defendant was not the shot that caused the death of the deceased. Considering this point, together with the instruction relating to accomplices, we hold that the use of the word "slayer" instead of the word "assailant" was immaterial.

Defendant next objects to instruction No. 14, as follows:

"You are further instructed that if you find and believe from the evidence in this case beyond a reasonable doubt that the defendant, Arthur Fanning, in this county and state, on or about the 24th day of December, 1920, acting alone or in connection with Elmer Fanning, Dave La Follette and Ed La Follette, or either of them, not in his real or apparent necessary self-defense, but unlawfully and with a premeditated design on his part to effect the death of the said Garnett L. Barker, did shoot or aid and abet in the shooting of said Garnett L. Barker, thereby killing him, then you find the defendant guilty of murder, as charged in the information."

Defendant says that this instruction does not give him the benefit of any lawful act on the part of those acting with him. In other words, it is claimed that there is evidence that Elmer Fanning and the two La Follettes were also acting in their own necessary self-defense. Assuming this to be true, we must remember that this was an instruction on the issue of murder, and that the jury found the accused guilty of manslaughter; thus eliminating the elements of murder.

The defendant claims self-defense for shooting a person who prior to that time had been mortally wounded by another. The language used in the instruction that, if the defendant did so act alone or in concert with the others, or either of them, "not in his real or apparent self-defense, but unlawfully and with a premeditated design," is sufficient to apprise the jury that, if these three were justified in doing what they did, then the guilt or innocence of the accused would rest on his act of aggression, or his want of aggression, measured by his own motives alone. This is mostly a matter of rhetorical construction rather than a construction of law, upon which a citation of authorities would be useless. In construing this and the preceding instruction examined we must bear in mind that both must be construed together in connection with the instructions on manslaughter and the other instructions given.

Upon consideration of the whole case, we think the instructions were fair to the defendant, and that he otherwise had a fair trial, and that the penalty of 7 years' imprisonment imposed was justified.

The judgment of the trial court is affirmed.

MATSON, P. J., and DOYLE, J., concur.