## FRED NELSON v. STATE.

No. A-5260. Opinion Filed May 6, 1926.
(245 Pac. 1009.)

188

 

Crump & Seawel and Matson & Mathers, for plaintiff in error.

George F. Short, Atty. Gen., and Houston B. Teehee, Asst. Atty. Gen., for the State.

DOYLE, J. Appellant, Fred Nelson, was tried on a plea of not guilty to an information, of which the charging part was as follows:

"That on or about the 5th day of October, 1923, in said county and state, the defendants Fred Nelson and Bethney Taylor, acting together, did then and there intentionally, wrongfully, and feloniously shoot one Bob Cooper, with a certain firearm, to wit, a .45 Colt's automatic pistol, with intent then and there and thereby to kill him, the said Bob Cooper, contrary to," etc.

On his separate trial the jury returned a verdict finding "the defendant Fred Nelson guilty of assault with a dangerous weapon, as charged in the information herein, and fix the punishment therefor at imprisonment in the state penitentiary for three years." To reverse the judgment rendered on the verdict he appeals. The appellant challenges the sufficiency of the verdict to sustain the judgment and sentence, in that it is too indefinite and uncertain by failing to name the offense.

The information charges the offense of shooting another with intent to kill under Penal Code (section 1756, C. S. 1921), and the instructions of the court submitted also the included offense of shooting another with intent to do bodily harm, and without intent to kill, as defined

by second clause of section 1764. Clemons v. State, 8 Okla. Cr. 452, 128 P. 739, cited by counsel, is not in point, because in that case the jury failed to fix the punishment.

It is the well-settled doctrine that, where the jury is required by statute to fix the degree of the crime of which the defendant is guilty, a verdict which does not expressly state the degree is sufficiently definite and certain as to the degree of which the defendant was convicted, if the assessment of punishment clearly indicates such degree. Bowlegs v. State, 9 Okla. Cr. 69, 130 P. 824.

This court in Coleman v. State, 16 Okla. Cr. 579, 194 P. 282, held that a verdict defective in form, but which expresses the intention and purpose of the jury, should have been objected to when returned, and thereby the attention of the court called to its defective form and an opportunity thus given for its correction. Section 2743, C. S. 1921.

And in Stansell v. State, 30 Okla. Cr. 265, 235 P. 937, we held that—

"Where, from an examination of the verdict and the entire record, the intent and purpose of the jury as expressed in their verdict, may be clearly ascertained, it will be upheld."

While the verdict in this case is technically informal, we think it is sufficiently definite and certain as to the offense for which defendant was convicted, and it is in effect a verdict of guilty of assault by shooting with a pistol without intent to kill, but with intent to do bodily harm. In our opinion the defect is not sufficient to affect the substantial rights of defendant, and he, having failed to object to the verdict when returned, waived any defect in the form of the same. Pruitt v. State, 17 Okla. Cr. 434, 190 P. 894.

This brings us to the merits of the appeal. It is con-

tended that the verdict is not sustained by sufficient evidence, and that it is contrary to law.

H. J. Enders testified that he saw Fred Nelson trying to get into his house, where Mrs. Taylor lived, and that Mrs. Taylor did not want to let him in; that he went around the house, and then three shots were fired; that he called the police; that a few minutes later the officers came, but that he did not hear any more shooting.

The complaining witness, Cooper, testified that he was assistant chief of police of Hominy. That in response to a telephone call he went to the home of Bethney Taylor. That Mr. Le Master, merchant police, was with him. That Le Master first went to the door and knocked and called, "Nelson," and then he knocked on the door and called several times, and there was no response. Then he took hold of the screen door, which was fastened by a wire or something, and it came loose. Then he walked in on the porch, and knocked on the house door, and called to Nelson to open the door. That he could see through a window east of the door, and saw Nelson coming out of the east room into the room where the door was, and he was coming towards him. That Nelson walked up to the window, and began firing through the window at him, firing four shots, one of which struck him on the right forearm. That he left Le Master at the house, and went to a phone, and called the chief of police. That the door and window were on the south side of the house, which sits on the rear of the lot next to the alley with a large house on the front of the lot.

On cross-examination he was asked:

"Q. What did you do to Nelson, when you arrested him? (State's objection sustained.)"

The jury was excused, and counsel for defendant made the following offer of proof:

"The defendant offers to show by the witness Cooper that, at the time of the arrest of defendant, witness assaulted defendant, Nelson, with a revolver, and beat him over the head, and cursed him, and said he ought to kill him." (The state's objection again sustained.)

Tom Le Master testified that he held a special police commission, and was with Mr. Cooper at the Taylor home; that he heard no noise in the house until the shooting began; that four shots were fired; that he could not see who did the shooting.

C. E. Carnegie, chief of police, testified that he arrived there about 1:30, and told Bob Cooper to call Bill Nelson, Fred's brother, and Bill Nelson went to the door and called Fred, and he opened the door and they arrested the defendants; that the door opened in from a screened-in porch.

The state rested, and the defendant moved for a directed verdict, which was overruled.

For the defense, Mrs. A. W. Worthington testified that she lived 15 feet back of Mrs. Taylor's; that she heard the four shots at the Taylor home, and heard no other disturbance there of any kind. Her husband's testimony was substantially the same.

Clarence Parmelee testified that he lived with the Worthingtons, and a minute or two before the shooting heard some one tear the screen door open.

Clarence Cope testified that he was a brother of Mrs. Taylor, and lived in the adjoining house; that he heard no disturbance other than the four shots in question; that defendant, Nelson, went home with him to stay all night, and they reached home about 11:30; that Mrs. Taylor was on the porch, and called to Nelson, and he went into the house with her.

Several witnesses residing in the immediate neigh-

borhood testified that no disturbance occurred there until after the officers arrived.

Mrs. Taylor, codefendant, called as a witness, was advised by the court as to her constitutional right against self-incrimination, and refused to claim exemption from testifying. She testified that her brother, Clarence, and defendant, Nelson, drove up to her house, and she called defendant in to see him about a car; that her adopted nine year old girl was also there; that she heard the screen door to the screened-in porch slam like it was jerked open. Then some one tried to raise the window. That she thought she was going to be robbed, or done bodily harm, and picked up a pistol, and fired four shots through the window; that, when she started into the room with the pistol, defendant said, "Don't do that." That defendant did not fire any shots or have anything to do with the firing of the shots. That defendant had caused no disturbance there, and that she had never heard him utter an oath, and that for about four months they were engaged to be married.

As a witness in his own behalf, Fred Nelson testified that he had been at the home of Mrs. Taylor probably 30 minutes; that he had gone there with her brother, Clarence. That after he had been there a while, they heard a noise like some one breaking in. Mrs. Taylor picked up a gun, and he said to her, "Don't do that." That he did not fire any shots, and did not advise or encourage any shooting. That he had no revolver or weapon of any kind. That after he was arrested Cooper grabbed him by the collar, and hit him with his gun, and started beating him, and his brother, Will Nelson, stopped Cooper. That they then started on for the jail, and Cooper said, "You was trying to kill somebody, wasn't you?" and he said, "I was not, I did not shoot," and Cooper said, "You know you are lying; you know you done this shooting," and he said, "I didn't; you know she did the shooting,"

and Cooper said, "I wish she was a man, I would beat her to death."

Austin Blair testified that the next day after the shooting, near the First State Bank, he heard Bob Cooper state that he had been trying to get Fred Nelson for a long time, and now he had him.

Error is also assigned on the exclusion of evidence of threats against his codefendant, and evidence of the communication of such threats to said codefendant.

The record shows that the court sustained the state's objections to the following questions asked of the witness William G. Nelson:

"Q. Did you hear any person make any statement relative to the security of Bethney Taylor in her person or in her home prior to the occasion of the shooting of Bob Cooper?

"Q. If you heard any such statement, did you thereafter communicate it to Bethney Taylor?

"Q. If you did communicate such information to Bethney Taylor, was it prior to the shooting of Bob Cooper?

"Q. State who, if anybody, made any statements to you prior to the shooting of Bob Cooper with reference to the security of Bethney Taylor, either in her person or in her home?"

The court directed the jury to retire, and the following offer of proof was made:

"That Randy Wren and John Morgan and the women that work at the White Star Cleaning establishment told the witness that it was the purpose of the women of the town of Hominy to see that Bethney Taylor was carried from her home and administered a whipping, and that thereafter the witness communicated these statements to Bethney Taylor."

The offer is denied, and defendant excepts.

We think that the evidence offered was competent and admissible, and that its exclusion by the court constitutes reversible error.

Our Penal Code provides:

"To use or to attempt to offer to use force or violence upon or toward the person of another is not unlawful in the following cases:

"First. * * *

"Second. * * *

"Third. When committed either by the party about to be injured, or by any other person in his aid or defense, in preventing or attempting to prevent an offense against his person, or any trespass or other unlawful interference with real or personal property in his lawful possession; provided the force or violence used is not more than sufficient to prevent such offence." Section 1762, C. S. 121.

Says Clark:

"A man is not bound to retreat from his house. He may stand his ground there and kill any person who attempts to commit a felony therein, or who attempts to enter by force for the purpose of committing a felony or of inflicting great bodily harm upon an inmate. In such a case the owner or any member of the family, or even a lodger in the house, may meet the intruder at the threshold and prevent him from entering by any means rendered necessary by the exigency, even to the taking of his life, and the homicide will be justifiable. The doctrine, however, does not justify a homicide merely to prevent a trespass upon the habitation, when it is evident that there is no intention to commit a felony or to inflict great bodily harm upon an inmate. Of course, in defending his habitation, a man must act upon appearances, and if he acts in the bona fide and reasonable belief that the assailant intends a felony or great bodily harm to an inmate, and kills him to prevent his entry, the homicide is not criminal, though he was mistaken as to the assailant's intention." The Law of Crimes, Clark & Marshall (2d Ed.) 409.

Says Wharton:

"An attack on a house or its inmates may be resisted by taking life. * * * (3) Aside from these two grounds, which may be also regarded as included in the right of prevention of felonies, the occupant of a house has a right to resist, even to the death, the entrance of persons attempting to force themselves into it against his will, when no action less than killing is sufficient to defend the house from entrance; and even the killing of an officer of the law, known to be such, endeavoring thus to intrude, is not murder, but manslaughter. A man's house, however humble, is his castle; and his castle he is entitled to protect against invasion. The rule is to be traced to old times when the peace of the body politic, as well as of individuals, depended upon the maintenance of the inviolability of houses as castles. And the rule continues to exist when there is an equal reason for the maintenance of the inviolability of houses as homes." 1 Wharton, Crim. Law (10th Ed.) par. 503.

See, also, 1 Bishop's New Cr. Law, §858.

In Armstrong v. State, 11 Okla. Cr. 159, 143 P. 870, we said:

"A man in his own habitation may resist force with force, and repel the entrance against his will of one who in a violent manner attempts to enter for the manifest purpose of assaulting or offering violence to him or to inmates under his protecting care, even to the extent of taking life, if it be actually or apparently necessary to do so in order to prevent such unlawful entrance."

And see Collegenia v. State, 9 Okla. Cr. 425, 132 P. 375.

The record shows that, when Mrs. Taylor, codefendant, was on the stand, the state's objections to the following questions were sustained:

"Q. Did you apprehend that you were about to be robbed or suffer great personal violence?

"Q. What did you think the party that had torn

open the screen and opened the window was going to do, Mrs. Taylor?"

"The Court: If she were on trial, it would be admissible, but I don't think it is so far as the defendant is concerned in this case. Objection will be sustained. (Exception.)"

The following offer of proof was made:

"We offer to show by the witness that at the time of tearing open of the screen and the opening of the window it caused her to apprehend that she was about to be robbed or sustain great personal injury. (Objection sustained.)"

The evidence excluded was competent and admissible for the purpose of showing, or tending to show, that his codefendant had reasonable ground of apprehension of imminent personal danger, and, assuming that her testimony was true, the shooting was justifiable in defense of her person, and that she did not use more force than was necessary to prevent an unlawful trespass and attempt to break into her home; therefore the exclusion of the same must have necessarily operated to deprive defendant of a fair determination regarding his guilt or innocence.

The next assignment is based upon the failure of the trial court to give an affirmative instruction on the theory of the defense that Mrs. Bethney Taylor, and not this defendant, did the shooting. The instructions given by the court only covered the testimony on the part of the state.

In Courtney v. State, 10 Okla. Cr. 589, 140 P. 163, we held:

"The accused, in a criminal case, is entitled to instructions defining the law applicable to his theory and covering his defense, if there is competent evidence tending reasonably to substantiate such theory."

In Collegenia v. State, supra, this court also held:

"In the prosecution for murder, the court should instruct upon the law applicable to the case, whether requested to do so or not. The law applicable is determined by the accusation and the evidence introduced upon the trial, and, when the evidence tends to show justification in self-defense and in defense of habitation it is the duty of the court to submit instructions properly embracing the law of self-defense."

According to the testimony of the prosecuting witness, defendant, Fred Nelson, fired the shots, and Bethney Taylor had nothing to do with it. According to the testimony of Bethney Taylor, she fired all the shots, and Fred Nelson not only did not fire a shot, but told her, "Don't do that." Defendant, Nelson, testified to the same effect, as did Bethney Taylor. Failure to instruct covering the defense interposed no doubt led the jury to believe that, even if Mrs. Bethney Taylor did fire the shots, that would not relieve this defendant of criminality, when the evidence showed that he was present at the time the shooting occurred.

This was not a planned assault. It occurred on a sudden impulse, and there was no testimony tending to show a conspiracy or concert of action.

In Moore v. State, 4 Okla. Cr. 212, 111 P. 822, we held that—

"It is error to instruct the jury that a person who stands by and consents or acquiesces in the commission of a crime is a participant therein. To be concerned in the commission of crime, one must either commit the crime himself, or procure it to be done, or he must aid, assist, abet, advise or encourage its commission."

Other questions are raised, but we forbear from further discussion of this case. It is evident from the record that the defendant did not have a fair and impartial trial.

For the errors indicated, the judgment of the lower court is reversed.

BESSEY, P. J., and EDWARDS, J., concur.