## JESSE POWELL v. STATE.

No. A-8319. June 4, 1932.
(12 Pac. [2d] 247.)

N. E. McNeill, for plaintiff in error.

J. Berry King, Atty. Gen., Smith C. Matson, Asst. Atty. Gen., and C. E. Mitchell, Co. Atty., of Pawnee (Prentiss Rowe, of counsel), for the State.

EDWARDS, J.  The plaintiff in error, hereinafter called defendant, was convicted in the district court of Pawnee county of manslaughter in the first degree, and his punishment fixed at imprisonment in the state penitentiary for a term of four years.

At the time of the homicide, defendant was about 70 years of age, resided alone on a farm.  The deceased, Floyd Bell, was a young man about 20 years of age.  From the evidence, we gather defendant was eccentric, and had been annoyed by persons entering his farm and not securely closing the gate and probably by other trespassers. On the day of the homicide, young Bell and some other boys left Bell's home on horseback and were driving some horses near defendant's farm, and as a pastime were jumping their horses across a ditch along the road.  While doing this, one of Bell's horses fell into a ditch so that it could not extricate itself.  Two of the boys went to a neighboring house to get a chain for use in getting the horse out of the ditch.  Not being able to secure one, Bell and a young man named Davis went to defendant's house. Defendant was not at home, but was down in the field. The boys found a chain on a water barrel, took it, and,

after getting the horse out of the ditch, Bell and a young man named Kendall went to defendant's house to return the chain. On arriving there, Bell began replacing the chain where he had procured it, and Kendall was at the pump getting a drink of water. In the meantime defendant came to his house and went down to the gate which the boys had used and found it partly open. He returned to his house, got an automatic pistol, and went to his field, and returned to his house as the boys were at the well replacing the chain. As he came to the barn, about 150 or 200 feet from the barrel and pump, he saw the boys there and demanded to know what they were doing. Upon this point defendant testified in part:

"* * * A. When he was over there I asked him, after he had told me he had just gotten back over the fence when he told me what he was doing. Q. Yes. A. He said, 'I had a horse get in the ditch and I came here to get this chain to pull him out.' I says, 'Well, that is all right, but why didn't you close my gate when you went out, so I could keep my hogs in there?' He said, 'I was in a hurry and the fellow that was with me I thought was going to shut the gate.' * * * A. After that I turned to the other boy and I said, 'Were you the one that was with him, that left it open?' He said, 'No.' I said, 'Well, now, if it wasn't you, who was it?' He said, 'I don't know.' 'Now,' I said, 'you needn't tell me that you don't know, when you have been playing with him all afternoon.' And then that made him mad and he just says, 'Now here' and just stepped off of the platform, just like he was coming to me, you know, and I had my hand—both hands in my pockets at the time, and I had the gun in my hand and when he started off, when he got off of the platform I shot him. * * * Q. Did you say that he stepped off the well platform and in what direction was he coming? A. He was coming right east off of the platform. A. All right. A. And he was just looking right at me, and I thought, you know, that he was aiming, that he was aiming to keep his eyes on me. He wasn't going like he was

going to get away, and so I just shot him, just aimed to shoot him in the leg. * * * Q. After he ran between the houses, did you look for the Bell boy? A. He had not gotten to the building until I looked for the Bell boy, and when I looked for the Bell boy he was on the south side of the well, coming over the fence. He just threw this foot over and then followed it up with this, and as he got on top of the fence, I was out that way, and I shot him right across there. * * *"

On cross-examination defendant testified:

"* * * A. I said, 'Now, you needn't tell me that you don't know because you have been playing with him all evening.' Q. That is when he stepped down off the —A. Off the platform. Q. Which way was he facing? Which way was his body facing at that time? A. Toward me. Q. But he stepped east off of the step? A. Yes, sir. He couldn't step over the pump. Q. He was standing right there when you pulled down on him? A. He came off the platform and stepped on the ground and I shot him. Q. He was standing stock still? A. No, sir, I couldn't say that he was because it was not but an instant before. * * * Q. He wasn't coming toward you, Mr. Powell, was he, when you shot him? A. He couldn't come to me without going over the pump, and he couldn't do that. * * * Q. He did not have anything in his hands, did he? A. I did not see anything. Q. You know that he did not have anything in his hands? A. I did not see anything. He did not see anything in my hands or he would have stopped. * * *"

The contention made is that the court erred in refusing defendant's requested instruction defining and setting out the right of a person to defend his domicile. Subdivision 3, § 1762, Comp. St. 1921. These requested instructions follow the law as announced in the cases of Dickinson v. State, 3 Okla. Cr. 151, 104 Pac. 923; Collegenia v. State, 9 Okla. Cr. 425, 132 Pac. 375; Marshall v. State, 11 Okla. Cr. 52, 142 Pac. 1046; Arm-Garrison v.

State, 19 Okla. Cr. 3, 197 Pac. 517; Garrison v. State, 9 Okla. Cr. 3, 197 Pac. 517; Nelson v. State, 34 Okla. Cr. 187, 245 Pac. 1009.

It is well settled that in a criminal case the accused is entitled to an instruction defining the law applicable to his theory and covering his defense if there is competent evidence tending reasonably to support his theory. But is there here from defendant's own testimony any defense of domicile? The two boys who were shot may possibly have been guilty of a technical trespass on defendant's premises, but when questioned by defendant they informed him of their purpose, to his satisfaction. Defendant evidently was angered by reason of his gate having been left open, and shot these boys without any substantial provocation. The law does not justify the use of a deadly weapon or the endangering of the life because of a mere trespass on or the invasion of real estate in the possession of another. In its most favorable light, defendant's testimony does not make out a case of defense of domicile, but from his standpoint tends to prove self-defense. The law applicable is fully covered by the charge of the court. Under all the evidence, the jury was fully justified in finding the plea of self-defense was not well founded and that the killing was not done under any actual or reasonably apparent danger to defendant from deceased and his companion. Under his own testimony, defendant is guilty of manslaughter, and the jury was extremely lenient in fixing the punishment at a term of four years in the penitentiary. There is no substantial error in the record.

The case is affirmed.

DAVENPORT, P. J., and CHAPPELL, J., concur.